COMMONWEALTH *vs.* MILLER M. BILLARD, JR. March 31, 1987. *Search and Seizure,* Automobile, Threshold police inquiry, Probable cause, Exigent circumstances. *Identification.*

The defendant Billard appeals from a judgment of conviction of (unarmed) robbery,[1] entered upon the verdict of a Norfolk County jury, and claims, first, that a motion judge committed error in denying his pretrial motion to suppress evidence obtained by the police in the course of two warrantless searches[2] and, second, that the trial judge erred in declining, during trial, to order a lineup to test a witness's identification of the defendant. There was no error.

1. Following, in summary, is the evidence brought out at the suppression hearing upon which the motion judge entered findings and conclusions favorable to the Commonwealth.

---

[1] The defendant was also indicted upon three charges of receiving stolen property, but the judge, feeling that "[i]t's a robbery case," directed verdicts of not guilty on those charges.

[2] The appeal puts emphasis on the second search.

At 5:41 P.M., February 21, 1985, Irwin Lurie, owner-manager of a local "Western Auto" store, called the Canton police station and told Sergeant Wolfe that a couple entered the store, the man forced him at gunpoint into a back room and took his wallet, the woman swept the cash from the cash register, and both fled. Lurie gave Wolfe a short description of the robbers. Wolfe promptly dispatched police cruisers to the spot. Officer Russell reported from the scene that two teenage girls, apparently a few minutes before the robbery, had seen a black man crouched over and doing something to the back license plate of a large yellow car parked a short distance from the store; there was a black woman in the passenger seat. Russell said the yellow car likely was an old Town model Lincoln Continental (one of the largest cars still encountered on the road), for Officer Brown, also at the scene, had added to the girl's account that earlier that day he had twice seen such a car with two black occupants on the Canton streets.[3] Detective Lehan, after speaking with Lurie, reported that Lurie described the male robber as black, 150-160 pounds, age about thirty, five feet seven inches, short hair, small moustache, and wearing a waist-length jacket, navy or blue shirt and dark trousers. The woman was black, five feet seven or eight inches, wearing a long coat and a brown knit hat.

As the robbers seemed headed in their car toward Boston, Sergeant Wolfe radioed the information he then had to the Boston police. He described what had been taken as cash and a wallet with credit cards. Around 6:00 P.M. Boston broadcast a corresponding message, but there was testimony by Boston police Officer Lydon that the message did not include reference to the nature of the loot. About 6:35 P.M. Lydon noticed a car that conformed to the description, carrying a black couple, at the corner of Essex and Washington streets, Boston. He followed in his cruiser and requested back-up. Police cars converged and stopped the yellow car at Beach and Oxford streets. The woman exited from the passenger side of the stopped car. Officer Pimentel saw the driver — the present defendant — emerge from the car and walk around the opened door toward the front of the car. He "was headed right up the middle of the street"; "it appeared to me he was going to flee down Beach Street, towards the Combat Zone." Pimentel intercepted the defendant physically. Asked for license and registration, the defendant produced only a license. The man and woman fitted their descriptions, except that the man's clothing was not as reported. One of the officers radioed headquarters and got again descriptions of the robbers which matched the couple. Now they were fully in custody. The Boston officers conducted a search of the car on the spot for weapons and found two replica flintlock pistols in the glove compartment.[4] There was a miscellany of clothing loose on the back seat.

---

[3] Brown had observed that the left front of the car was damaged and that orange colored dice were suspended from its rear view mirror.

[4] One of these could have been used at the robbery, as the man had threatened Lurie only with a weapon handle showing at his waistband.

The two suspects and their car were moved to a Boston police station and thence to the location of the Western Auto store in Canton. One of the purposes was to conduct a "show up ID." At the scene, Officer Lydon secured information from Lurie about what had been stolen; in the presence of Canton Sergeant Wolfe, he undertook a further search of the car.[5] This was perhaps an hour after the Boston stop. Found were a check of I. and J. Sales (doing business as Western Auto), a personal check of Irwin and Joan Lurie (husband and wife), and Joan Lurie's hospital card. These papers — according to Lurie, they came from his wallet — were stuck in the fold or crevices of the front seat. In the woman's wallet had been found $117 in bills in the denominations mentioned by Lurie, with the number of one dollar bills (over twenty) approximating Lurie's estimate.

In his findings, rulings, and order on the defendant's motion to suppress, the motion judge dealt succinctly with the claim that either of the searches was illegal. The judge held (without even referring to the testimony about the defendant's attempt at flight) that the initial search was "constitutionally valid as being a weapon search, probable cause being established by the circumstances." The conclusion was justified, and it appears that the police could well have looked for more than weapons when they first entered the car. The officers concededly had the right to make a threshold stop of the Lincoln. When the defendant and his companion got out of the vehicle and it became clear that they matched their descriptions, there was a confluence of factors creating probable cause to arrest and thus to make a comprehensive search of the car.[6] See *Chambers* v. *Maroney*, 399 U.S. 42, 46-47 (1970); *Commonwealth* v. *Avery*, 365 Mass. 59, 64 (1974); *Commonwealth* v. *Barnes*, 2 Mass. App. Ct. 357, 360 (1974).

As the trial judge noted, "[t]here were exigent circumstances at the time of the stop in Boston" — a city street at night was not a feasible place to conduct a full search of an automobile. If, as we have indicated, an immediate full search would have been proper, so also would be one conducted after a short interval at a better location, with precise information at hand: thus the second search at Canton. Confirming the legality of both searches is *Commonwealth* v. *Markou*, 391 Mass. 27 (1984). See *Texas* v. *White*, 423 U.S. 67, 68 (1975); *Commonwealth* v. *Rand*, 363 Mass. 554, 558-560 (1973); *Commonwealth* v. *Barnes*, 2 Mass. App. Ct. at 360-361.

2. The defendant moved pretrial for nonsuggestive lineup with a view to testing Lurie's identification of the defendant stemming from the initial and the later encounters. The motion judge referred this motion to the trial judge. As the trial was about to begin, defense counsel inquired of the trial judge whether he had given thought to the motion. Remarking that no

---

[5] Canton Officer Brown, on seeing the car after its return to Canton, was certain it was the one he had observed earlier; it conformed in the details mentioned at n. 3.

[6] It may be, as the Commonwealth suggests, that the initial search can be justified as a limited protective search incident to an investigative inquiry, see *Commonwealth* v. *Almeida*, 373 Mass. 266, 271-273 (1977), but the point need not be decided.

Rescript Opinions.

affidavit, as required by Mass.R.Crim.P. 13(a) (2), 378 Mass. 871 (1979), had been offered to support the motion, the judge denied it. The defense, it seems, lost interest in a lineup to test Lurie, as no mention was made of it when Lurie took the stand or thereafter. The question of a lineup did come up during the testimony of Jennifer Alessi, one of the teenagers. Her sister Kelley had testified that she could not make an identification on the basis of her view of the man crouched behind the yellow car. Jennifer, however, thought she could, although she had not made an identification from pictures shown to her before trial. When the defense objected to Jennifer's giving identification testimony, the judge suggested and allowed a voir dire, with questioning of Jennifer conducted by defense counsel. The judge ruled that Jennifer had had an adequate opportunity to view the man crouched behind the Lincoln and so had an independent basis for her identification not contaminated by suggestiveness. He denied a defense motion for a lineup to test the witness. It is enough to say that allowance of a lineup is largely in the discretion of the judge, see *Commonwealth* v. *Jones,* 362 Mass. 497, 501 (1972); *Commonwealth* v. *Pearsall,* 370 Mass. 413, 415 (1976), and here it would have been a farce: the defendant, the only black man in the courtroom, had been under Jennifer's observation during the trial, and her selection of the defendant at a lineup would have been nearly inevitable and altogether meaningless.

*Judgment affirmed.*

*Roxana Marchosky* for the defendant.
*Charles J. Hely,* Assistant District Attorney, for the Commonwealth.