Whitehead, J.
INTRODUCTION
The defendant stands indicted for the crimes of armed robbery, receiving stolen property (over $250), and unlawful possession of a firearm (away from home or work). He has moved to suppress certain statements which he is alleged to have made to the Brookline Police on November 29, 1993 and certain physical evidence which was seized from his automobile and his person at that time. A hearing was held on November 2, 1994. The following constitute the Court’s findings of fact, rulings of law and order on the motion.
FINDINGS OF FACT
Between October 27, 1993 and November 11, 1993, four armed robberies having common circumstances were reported to the Newton and Brookline police. The first such armed robbery allegedly occurred on October 27, 1993. On that date, a male complainant told the Newton police that, late in the evening, he had left a Star Market located near the Newton-Brookline boundary and had proceeded to his residence in Newton. Upon his arrival at the residence, he was robbed at gunpoint. The complainant described his assailant as a “mulatto” male; approximately 5’9" in height; having a medium build; wearing dark running clothes; and displaying a silver handgun.
A short time later on the same date, a .second complainant reported to the Brookline Police that she, too, had left the same Star Market late in the evening and that she had been robbed at gunpoint upon her arrival home in Brookline. She described her assailant as a black male; approximately 5T0"-5’11” in height; and displaying a silver handgun. She also stated that he had been driving a station wagon.
On November 4, 1993, a third complainant told the Newton Police that, late in the evening, she had left a Legal Seafoods restaurant, which is located approximately 100 yards from the previously mentioned Star Market, and, while headed home, she, too, was robbed at gunpoint. She described her assailant as a light-skinned black male; approximately 5’9"-6’0'' tall; wearing a dark running suit and wool cap; and displaying a silver handgun.
Lastly, on November 11, 1993, a fourth female complainant reported to the Newton police that she had been robbed at gunpoint, again late in the evening, at the Sterling Bank, in Newton. The Sterling Bank is located in reasonably close proximity to the Star Market and the Legal Seafoods restaurant referenced earlier. The complainant stated that she and a companion had been bringing a night deposit from a store within the Atrium Mall to the bank. Upon their arrival at the bank, a man came out of nearby woods, displayed a handgun and stated, “Give me the money.” She described the assailant as a light-skinned black male; wearing a three-quarter length brown leather jacket; and displaying a silver handgun.[1]
The complainant’s companion had pursued the assailant as he fled. The companion observed the assailant enter a maroon or rust-colored “K-car type” station wagon. (A “K-car” is a Chrysler-make automobile characterized by a “squarish” or “boxy” appearance.) The companion pursued the vehicle down Route 9, in Newton, and onto the Hammond Pond Parkway. When she lost sight of the vehicle, it was headed toward Brookline.
Noting the obvious similarities among the circumstances of the four reported robberies, the Newton and Brookline police departments undertook a joint investigation of them. Participating in that investigation were Detective Edward Aucoin, of the Newton Police Department, and Detectives Barry McNeilly and Laurence Crapo of the Brookline Police Department. As a result of an exchange of informa *257 tion, each officer became privy to all of the facts detailedabove.
On November 29, 1993, a fifth armed robbery was reported, this time to the Newton police. It is this fifth alleged robbery which has given rise to the indictments presently at issue. At approximately 10:50 p.m., a female caller, later identified as one Jean Broderick, stated over the telephone that she had just been robbed at gunpoint while she was at the Sterling Bank. She described the perpetrator as a light-skinned black male; approximately 5’10"-5’11" in height; having a medium build; having a slight mustache; wearing dark clothes; and displaying a silver handgun.
Detective Aucoin directed that the dispatcher relay the substance of the call, including the description of the perpetrator, to all police units in Newton and in Brookline. Based upon his knowledge of the alleged robberies previously reported, he further directed the dispatcher to indicate that the perpetrator might be wearing a three-quarter length dark-colored leather coat and that he might be travelling in a maroon or rust-colored K-car type station wagon. The dispatcher put out the information as directed.
Detective Aucoin then proceeded to the Sterling Bank, where he spoke with Ms. Broderick and a female companion of hers, Beatriz Johnson. At that time, Ms. Broderick stated that she was an employee of a retail store located at the Atrium Mall. She and Ms. Johnson had travelled from the mall to the bank in order to make a night deposit of the store’s receipts. As the two women approached the bank, the perpetrator came out of nearby woods, displayed a gun and said, “Give me the money.” She repeated the description that she had given over the telephone and added that the perpetrator had been wearing a black, three-quarter length leather coat, jeans and a watch cap.
Brookline Detective McNeilly had heard the substance of the Newton radio broadcast when it was put out. Based upon his knowledge of the previous reported robberies, he instructed other Brookline officers to watch out for a red or maroonish K-car type station wagon heading from Newton to Brookline. Given the time at which the most recent robbery had occurred and his belief, based upon the circumstances of the previous robberies, that the perpetrator might be travelling from Newton through Brookline via, first, the Hammond Pond Parkway and, then, the West Roxbury Parkway, he projected a point on the West Roxbury Parkway where he might be able to intercept the perpetrator as he (Detective McNeilly) travelled from his current location. With his partner, Detective Crapo, he proceeded to that point.
In fact, the Brookline detectives travelled out of Brookline to the Finn Rotary, located on the West Roxbury Parkway, in the City of Boston. There they observed a maroon-colored station wagon heading around the rotary from the general direction of Newton. The vehicle was not a “K-car,” but rather a “Pontiac 6000.” Photographs of the vehicle comprise Exhibits ##2 and 3. The Court has examined the photographs and concludes that the vehicle possesses the same “squarish” or “boxy” characteristics of a “K-car.”
From their initial vantage point, the Brookline detectives could not determine the number or appearance of the occupants of the station wagon. They continued to follow the vehicle, further along the Parkway, within the city limits of Boston. The detectives had no authority as police officers within the City of Boston.
At a traffic light in Boston, the Brookline detectives pulled alongside the station wagon. When they did so, they were able to observe the interior of the vehicle. The driver was the sole occupant. They observed that he was a light-skinned black male having short hair and a thin mustache. He appeared to be in his early 20s. They could not determine his height and weight. As both vehicles proceeded on, the officers ran a stolen vehicle check and determined that the station wagon had not been reported stolen. At that point, they activated the blue lights of their own vehicle and directed that the station wagon pull over, which it did.
The detectives pulled up behind the station wagon in their unmarked vehicle. They were in plain clothes. However, Detective Crapo, at least, wore his badge on a chain around his neck. Both detectives exited their vehicle and proceeded to the station wagon. Detective McNeilly arrived at the front passenger-side door of the station wagon first. Looking in, he observed the driver to be leaning towards him as if preparing to speak with him. The driver’s hand was inside a console which was located in the front-seat area of the vehicle.
Detective McNeilly gestured to the driver to direct his attention to the driver’s-side window, at which Detective Crapo had arrived. The driver removed his hand from the console and turned toward Detective Crapo. Detective Crapo identified himself as a police officer and asked the driver to produce his driver’s license and certificate of registration for the vehicle. The driver complied. Both documents were in order. The driver was Jaka Claiborne, the defendant.
Detective Crapo next asked the defendant to whom the vehicle belonged. The defendant replied, “My father.” Noting a police sticker on the vehicle, Detective Crapo stated, “So the car is your father’s. Is he a police officer?” The defendant replied in the affirmative. Detective Crapo then advised the defendant that a crime had been committed in Newton; the defendant fit the description of the perpetrator; and the vehicle fit the description of one used in similar crimes. The defendant responded, “OK.”
*258 At that point, Detective Crapo stated, “If your father is a police officer, you understand that, due to the serious nature of the crime, I’ve got to ask you to step out.” The defendant thereupon exited the vehicle. As he and the two detectives stood between the station wagon and the roadway, Detective Crapo said, “A serious crime took place in which a gun was involved. If you’re not involved, I apologize in advance, since you’re a police officer’s son.” He then asked, “Where are you coming from?” The defendant replied that he was travelling from the home of a friend in Roslindale to his own home in Hyde Park. Detective McNeilly interjected, “You’re headed in the wrong direction.” (In fact, it was perhaps more accurate to state that the defendant was not taking the most direct route.) The defendant then stated that he was coming from school in Framingham and headed home. Detective McNeilly asked if he had travelled along Route 9 as far as the Chestnut Hill Mall (the approximate area of the robbery). The defendant replied that he had.
At that point, Detective McNeilly walked to the rear of the station wagon and, using his portable radio, called for a complete description of the robber as reported by Ms. Broderick. The dispatcher, who, I infer, had obtained the information from Detective Aucoin at the scene of the alleged crime, replied with a description that included a black ski cap and a black leather jacket.
Detective Crapo heard the supplementary description on his own portable radio. At the time that the defendant had exited the vehicle, he had noticed a black leather jacket bunched up on the driver’s seat. Immediately after hearing the broadcast description, he observed a black knit cap on the rear floor of the passenger side of the vehicle. In that instant, he spun the defendant around against the vehicle; told him to put his hands on the roof; directed Detective McNeilly to call for a back-up and to draw his service weapon; and pat-frisked the defendant. Although he did not specifically so testify, I assume that he took those actions because he had quickly come to conclude that the defendant could well be the alleged robber and he was in fear of his safety.
The pat-frisk produced no weapon. However, Detective Crapo kept the defendant against the vehicle. Detective McNeilly called for back-up, and within a couple of minutes a marked Brookline cruiser arrived with two uniformed officers. When the additional officers arrived, Detective McNeilly brought the defendant to the rear of the station wagon, where he was joined by the two uniformed officers. No service weapons were drawn. Detective McNeilly then told the defendant that he fit the description of the suspect in a robbery which had happened shortly before, as well as several other robberies. The defendant responded, “I robbed the ladies tonight. I didn’t do any of the other robberies.”
At that point, Detective McNeilly, reading from a printed card, gave the defendant the full “Miranda warnings.” In response to a question from Detective McNeilly, the defendant stated that he understood his rights. He did not appear to be under the influence of drugs or alcohol or to have any other impairment of his mental faculties. Detective McNeilly asked him “Where is the money you got tonight?” The defendant replied, “In my left front pocket.” At that point, Detective McNeilly reached into the pocket and recovered $812 in cash. He then asked where was the bag in which the money had originally been contained. The defendant replied that he had thrown it out of the window.
Simultaneously with the conversation which took place between Detective McNeilly and the defendant, Detective Crapo undertook a search of the station wagon. Although, in the eyes of Detective Crapo, the defendant was not under arrest at the time, Detective Crapo knew that a gun allegedly had been used during the reported robbery, that the defendant may well have been the perpetrator of the robbery and that the gun had not been found on the person of the defendant. Again, although Detective Crapo did not specifically so testify, I infer that he searched the vehicle when he did because he remained concerned for the safety of all of the officers and wished to secure the gun. As it was, the defendant was standing only a few feet from the vehicle when Detective Crapo commenced the search.
Detective Crapo found a silver-plated revolver, with the hammer cocked, in the center console from which the defendant had withdrawn his hand at the time of the stop. Although there was no direct evidence on the point, I infer that at some later time, still at the scene of the stop, the officers retrieved from the vehicle the leather coat and wool cap which Detective Crapo had observed upon first speaking with the defendant. Also, at some point after the gun was retrieved, Ms. Broderick and Ms. Johnson were taken to the scene of the stop, where they identified the defendant as the robber.
RULINGS OF LAW
Based upon the above facts, the Court makes the following rulings of law:
Police officers, acting within their authority, have a right to “stop a vehicle in order to conduct a threshold inquiry if [they have] a reasonable suspicion that the occupants have committed, are committing, or are about to commit a crime. [This] suspicion must be based on specific articulable facts and reasonable inferences drawn therefrom. A hunch will not suffice.” Commonwealth v. Moses, 408 Mass. 136, 140 (1940), quoting Commonwealth v. Wren, 391 Mass. 705, 707 (1984). At the time that Detectives McNeilly and Crapo first sighted the maroon station wagon at the Finn Circle, in Boston, they did not possess sufficient information to undertake an investigative stop. The *259 knowledge which they possessed concerning the four earlier reported robberies, together with their knowledge of the robbery which had been reported that evening, did warrant a reasonable belief that the perpetrator of all five reported robberies was the same man, and that he would be travelling in a maroon-colored “boxy” station wagon in a direction headed from Newton through Brookline. However, common experience indicates that maroon-colored “boxy” station wagons appear with sufficient frequency that there was no specific basis to conclude that the one which the officers had sighted was being operated by the robber. In fact, one of the detectives acknowledged as much during his testimony.
The circumstances did not change until the detectives had followed the vehicle further into the City of Boston. A pivotal question then becomes, what authority did the Brookline detectives have to act in Boston? The Court passes on that question for the moment and proceeds on the assumption that the officers maintained their police powers (if not in fact, then in essence) for the balance of their dealings with the vehicle.
When the detectives pulled alongside the station wagon at a traffic light in Boston, they were able to observe that, not only did the station wagon match the general description of a likely getaway vehicle, but the operator matched the general description of the reported assailant. At that point, an investigative stop was justified. See, e.g., Commonwealth v. Andrews, 34 Mass.App.Ct. 324, 327-28 (1993), and authorities cited.
There are cases which suggest that the fact that a suspect has matched the description of the alleged perpetrator is sufficient to constitute not only valid grounds for an investigative stop, but probable cause to arrest as well. See, e.g., Commonwealth v. Lawton, 348 Mass. 129, 131-33 (1964); Commonwealth v. Harris, 11 Mass.App.Ct. (1981). However, in the present case, both the description of the suspect and the description of the suspect’s vehicle were general in nature and, even when taken in combination, would possibly apply to a large number of people travelling on the road in question. “A description equally applicable to a large number of people, without more, may not support a finding of probable cause.” Commonwealth u. Carrington, 20 Mass.App.Ct. 525, 528 (1985). Here, the Court concludes that more was required to establish probable cause for an arrest.
As already noted, however, the stop was valid, and the stop itself yielded additional information. Upon their initial contact with the operator of the station wagon, the detectives observed his hand in a console. In response to the detectives’ questions, he gave conflicting accounts as to his whereabouts and route of travel during the evening. Ultimately, he acknowledged that he had passed by the area where the robbery had reportedly occurred. Lastly, Detective Crapo observed both a three-quarter length dark leather jacket and a wool cap in the vehicle, each being consistent with items of clothing allegedly worn by the perpetrator of the most recent robbery. In the view of the Court, at that point a “particularized suspicion” that the defendant was the reported robber was converted to “probable cause.” See, e.g., Commonwealth v. Reed, 23 Mass.App.Ct. 294, 297-98 (1986) (conduct of suspect indicating consciousness of guilt, when combined with fact that suspect met detailed description of perpetrator, gives rise to probable cause). See also Commonwealth v. Certa, 13 Mass.App.Ct. 230, 234 (1982). Compare generally Commonwealth v. Carrington, supra. Probable cause continued to exist even after the pat-frisk conducted by Detective Crapo produced no weapon.
Given the existence of probable cause to believe that the defendant had committed the reported robbery, given the fact that clothing apparently worn by the robber was plainly visible inside of the car, and given the fact that no gun had yet been found, Detective Crapo also possessed probable cause to believe that the gun, and perhaps other evidence of the crime, was located inside of the vehicle as well. Moreover, given the lateness of the hour, the location of the stop (a major thoroughfare outside of the officers’ territory), and the nature of the item being searched for (a gun), exigent circumstances existed which justified an immediate warrantless search of the vehicle and seizure of the gun and clothing. See, e.g., Commonwealth v. Billard, 23 Mass.App.Ct. 1019, 1021 (1987), and authorities cited. A similar search of the defendant was justified as well.
Did the police elicit the defendant’s statement that he “only robbed the ladies tonight” — a statement made before “Miranda warnings” had been administered — in violation of the Miranda requirements; and were his subsequent admissions inadmissible “fruits” of that statement, the “cat” having been “let out of the bag”? The answer to those questions turns on whether or not the defendant was in custody at the time of the initial statement, for the Miranda requirements apply only to “custodial interrogations.”
The Supreme Court of the United States has indicated that a detention of a defendant pursuant to an investigative stop does not render a suspect “in custody” and thereby invoke the Miranda requirements. However, an arrest of the suspect does. See Berkemer v. McCarthy, 468 U.S. 420, 439-40 (1984). The Appeals Court of this Commonwealth has summarized the test to determine whether a detention has become transformed from an investigative stop to an arrest, as follows:
In deciding whether the actions of the police exceed the scope of an investigative stop, the pertinent inquiry is whether the degree of intrusion is reasonable under the circumstances. Commonwealth v. *260 Moses, 408 Mass. [136], 141 [1990]. To be reasonable, “the degree of intrusiveness on a citizen’s personal security, including considerations of time, space and force, must be proportional to the degree of suspicion that prompted the intrusion.” Commonwealth v. Borges, 395 Mass. 788, 794 (1985).
Commonwealth v. Andrews, 34 Mass.App.Ct. 324, 328-29 (1993). It is that test which this Court applies in the present case.
The question of whether or not the defendant was under arrest when he made his initial admission is a close one. Certainly, the detectives’ level of suspicion was high; they had used force to detain the defendant against the vehicle and to pat-frisk him; they had summoned back-up officers who had increased the total number of officers to four. All of those factors might well support the argument that the defendant was in fact, under arrest. On the other hand, the crime for which the detectives had stopped the defendant was among a series of violent ones, during all of which a gun had been used. Given the mounting circumstances pointing to the defendant as the perpetrator, the officers could well conclude that their safety was in danger unless and until they could secure the gun and obtain additional support. Doing so would be appropriate even though the acquisition of additional evidence, such as an in-person identification by the alleged victims or a more detailed account of his whereabouts from the defendant, might well be desirable before effecting an actual arrest.
On balance, the Court concludes that the continued detention of the defendant at the time that he made his initial admissions was part of the initial investigative stop. The police were acting to protect themselves. Their actions were reasonable and proportional to the degree of suspicion which they possessed and did not exceed the permissible limits of an investigative stop. Compare Commonwealth v. Andrews, supra at 328-30. The defendant was not under arrest. No “Miranda warnings” were necessary.
Once the defendant made the initial admission, he was under arrest. However, at that point, “Miranda warnings,” were given, and the defendant made a knowing, voluntary and intelligent waiver of them. The Court further concludes that all of the defendant’s statements were the product of a free and rational intellect, that is to say, the statements themselves were voluntary in nature.
The Court returns, then, to the question which it initially passed upon, namely, did the Brookline detectives possess the authority to make an investigative stop for a felony, in Boston, when the facts justifying such a stop did not become known to them until they had crossed into Boston? If the answer is in the negative, all of the evidence which they acquired as a result of the stop must be suppressed. Given the Court’s previous discussion of the issues, if the answer to the question is in the affirmative, all of the evidence stands admissible.
The appellate courts of the Commonwealth have never directly addressed the question of what authority a police officer has to conduct an extra-territorial investigative stop for a felony. See Commonwealth v. Dise, 31 Mass.App.Ct. 710, 703, fn. 3 (1991). But see also Commonwealth v. LeBlanc, 407 Mass. 74 (1990) (Court explicitly ruled invalid extra-territorial motor vehicle stop for non-arrestable traffic violation). In the context of an extra-territorial arrest for a felony (as opposed to an investigative stop), both the Supreme Judicial Court and the Appeals court have held that absent a statutory exception for cases of “fresh and continued pursuit” initiated within the officer’s jurisdiction, a police officer possesses only the power of a private citizen to make such an arrest. Commonwealth v. Grise, 398 Mass. 243 (1986); Commonwealth v. Dise, supra; Commonwealth v. Harris, 11 Mass.App.Ct. 168-72 (1981). The power of a private citizen to arrest is limited to circumstances where there is probable cause to believe that the suspect has committed a felony. Id.
If, in the absence of fresh and continued pursuit initiated within an officer’s jurisdiction, the power of a police officer to arrest is no greater than that of a private citizen, then, presumably, the power of a police officer to conduct an investigative stop is similarly circumscribed. This Court is aware of no authority possessed by a private citizen to conduct an investigative stop in the circumstances of this case. Indeed, the Supreme Judicial Court has noted, “At common law, the privilege of a private citizen to detain a person for questioning has been limited to cases involving shopkeepers who reasonably believe that a shoplifter has taken goods from his counter.” Commonwealth v. Gullick, 386 Mass. 278, 283, fn. 4 (1982). That being so, it would appear that Detectives McNeilly and Crapo possessed no authority to conduct an investigative stop of the defendant. See generally, State v. Chapman, 376 So. 2d 262 (District Court of Appeal of Florida, 1979) (absent statutory exception, police officer possesses no common law right to conduct investigative stop outside of his jurisdiction); Churchwell v. Commonwealth, 366 S.W.2d 336, 339-40 (Ky.App. 1993) (same conclusion); People v. Fenton, 154 Ill.App.3d 152, 506 N.E.2d 979 (1987) (same conclusion), reversed on other grounds, 125 I11.2d 343, 532 N.E.2d 228 (1988). See also State v. Jones, 263 La. 164, 185-86, 267 So.2d 559, 567 (1972) (Barham, J., dissenting).
A police officer in this Commonwealth may make an extra-territorial arrest, if the arrest follows a fresh and continued pursuit initiated within the territory of the officer’s jurisdiction. See Commonwealth v. Zirpolo, 37 Mass.App.Ct. 307 (1994). However, such authority is conferred by statute, G.L.c. 41, §98A, and does not extend to investigative stops. Even if it did, it would be *261 of no application here. The detectives did not even see the station wagon until they had entered Boston. Hence, there was no “pursuit” into Boston.
The Brookline detectives acted with commendable alertness, and that alertness brought success. There is a temptation to exercise the logic that good police work which brings productive results must necessarily be lawful. To conclude otherwise, one might argue, would be to discourage good work and demoralize those who undertake it. However, the Supreme Judicial Court has maintained a narrow definition of a police officer’s authority while outside his jurisdiction, even where a broader definition might have brought about certain desirable results. See Commonwealth v. Grise, 398 Mass. 247, 252 (1986) (Court declined to permit extra-territorial arrest for operating under the influence of liquor even though permitting arrest furthered strong public policy against drunk driving).
As stated earlier, a police officer operating outside of his territory stands in the shoes of a private citizen. The chaos which would be engendered by permitting private citizens generally to undertake investigative detentions is not difficult to imagine. It was to avoid similar chaos that the Court in Grise declined to extend citizens’ arrest powers to misdemeanors. Sharing the concerns of the Supreme Judicial Court, this Court concludes that, in the circumstances of this case, the extra-territorial stop of the defendant was impermissible. All of the fruits of the stop must be suppressed. See generally Commonwealth v. LeBlanc, 407 Mass. 70, 75 (1990) (total suppression of all fruits is appropriate remedy for unlawful extra-territorial stop).
ORDER
It is hereby ORDERED that the defendant’s motion to suppress physical evidence and statements be ALLOWED.

One or more of the four complainants also described the assailant as being in his early 20s.