COMMONWEALTH *vs.* RUDDY LARA.

No. 94-P-670.

Suffolk. October 18, 1995. - December 19, 1995.

Present: PERRETTA, KASS, & IRELAND, JJ.

*Search and Seizure,* Automobile. *Constitutional Law,* Search and seizure.
*Practice, Criminal,* Argument by prosecutor, Fair trial.

A warrantless search of an automobile, conducted at a police station park-
ing lot to which the vehicle had been removed a short time after police
officers had stopped and arrested the driver on a public way, was lawful
where probable cause and exigent circumstances justifying a warrant-
less search existed when the vehicle was first stopped. [548-549]
At a criminal trial the prosecutor's persistent injection of irrelevant refer-
ences to the ethnicity of the defendant and the drug operation of which
it was suggested he was a part, which served no apparent purpose other
than to play on the fears and possible prejudices of the jury, denied the
defendant of his right to a fair trial. [549-552]

INDICTMENTS found and returned in the Superior Court
Department on September 20, 1990.

A pretrial motion to suppress evidence was heard by *Pat-
rick F. Brady,* J., and the cases were tried before him.

*James E. McCall* for the defendant.

*Jill P. Furman,* Assistant District Attorney, for the
Commonwealth.

KASS, J. Repeated references in the testimony of the gov-
ernment's principal witness to "Spanish We Deliver" and
"Dominicans" gratuitously highlighted the defendant Lara's
ethnic background. They tainted the presentation to the jury
of the Commonwealth's charges against Lara of trafficking in
twenty-eight grams or more of cocaine (G. L. c. 94C,
§ 32E[b][2]) and unlawful distribution of cocaine (G. L.
c. 94C, § 32A[c]). Lara is, therefore, entitled to a new trial.
We affirm, however, the denial of a motion to suppress drugs

found in a search, made after Lara's arrest, of the car he was driving when apprehended.

1. *The motion to suppress.* We summarize the facts found by the motion judge, with some supplementary details taken from the record. On August 2, 1990, three Boston police detectives assigned to a drug control unit had under observation the Edward Everett Square area in the Dorchester section of Boston. One of the detectives, Paul Martin, watched a woman park on a side street, walk across Columbia Road, and then walk along Massachusetts Avenue past several public telephones to a particular pay phone that Detective Martin, from prior experience, understood to be used by buyers to place orders with a narcotics delivery ring. The woman held a brief telephone conversation and returned to her car, in which she waited some fifteen minutes. At the end of that period, the woman drove to the intersection of Dorchester Avenue and Columbia Road, where she once again made a short telephone call and returned to her car to wait.

Some ten minutes later, a white 1981 Honda automobile with two occupants pulled up nearby and parked. Lara, who had been at the wheel, walked to the woman's car and talked to her. She accompanied Lara to his car and climbed into the back seat. Detective Martin walked by and saw the woman give money to Lara and receive a plastic bag from the passenger in Lara's car. The woman then returned to her automobile and, as she started to drive off, was intercepted and arrested by Detective Martin. Told that she was to be searched, the woman pulled a plastic bag of cocaine from the watch pocket of her jeans. Before stopping the woman, Martin had sent a radio message to a pair of collaborating detectives, asking them to stop and arrest Lara and his passenger. One of the detectives, Michael Primm, made an unproductive cursory search of the Honda on the spot and then took the car to the police station. There, Primm conducted a further search. Behind a speaker cover he pried off the dashboard, he found a cache of forty individually wrapped bags, each of which proved to contain cocaine.

Detective Primm conducted his later search of Lara's automobile without a search warrant, an unlawful act, Lara contends, because by that time the car was safely in the police station parking lot, and the police officers had leisure to obtain a warrant. As Detective Primm was obliged to pry covers off the dashboard to find the incriminating material, the search could not convincingly be characterized as an inventory search, see *Commonwealth* v. *Figueroa*, 412 Mass. 745, 748-750 (1992), and the Commonwealth does not attempt so to do. Rather, the government relies on the "automobile exception" that permits a search of a car after its removal to a police station if probable cause for a search and accompanying exigent circumstances would have justified a search without a warrant when the car was first stopped. *Chambers* v. *Maroney*, 399 U.S. 42, 52 (1970). *Commonwealth* v. *Markou*, 391 Mass. 27, 29-32 (1984).

Underlying the *Markou* decision is the idea that if a search is constitutionally permissible on the street, with attendant risks (attempts to interfere with search, exposure to traffic) and awkwardness (tools not at hand, obstruction of traffic), the occupants of the car are no worse off (i.e., suffer no greater intrusion) if the search is continued in the secure setting of the police station. 391 Mass. at 30. See also *United States* v. *Ross*, 456 U.S. 798, 807 n.9 (1982); *Commonwealth* v. *Bakoian*, 412 Mass. 295, 304-305 (1992); *Commonwealth* v. *Billard*, 23 Mass. App. Ct. 1019, 1021 (1987). The defendant attempts to distinguish *Markou* on the ground that at the time when Peter Markou's car was stopped and searched in Williamstown, there were only two police officers on duty. One of those two could ill be spared to chase a search warrant. In Boston, by contrast, there was an ample supply of officers who could have obtained a search warrant. It is not a significant distinction because the cases to which we have referred emphasize the practical good sense of treating a prompt police station search as an extension of the street search which was or could have been made, rather than the unavailability of police officers. As the *Markou* opinion suggests, see 391 Mass. at 31, if the police station

search of a car is long delayed after the initial car impoundment, e.g., twenty-two hours as in *State* v. *Quinn*, 290 Or. 383, 390-392 (1981), the underlying theory of exigent circumstances becomes unconvincing, and the search may be bad. In the instant case, however, Detective Primm's search of the Lara automobile occurred within fifteen minutes after Primm brought it to the station lot. The motion to suppress was rightly denied.

2. *Injection of the defendant's ethnic background.* During her opening, the assistant district attorney referred twice to a "Spanish We Deliver" drug selling operation that responded to telephone orders. During her direct examination of Detective Martin, the prosecutor, over objection, asked:

> "Are you familiar with a Spanish We Deliver phrase? Are you familiar with that phrase?"

The witness answered, "I am," and when asked "what is your familiarity with Spanish We Deliver," answered as follows:

> "Spanish We Deliver, for the Boston Police Drug Control Unit, and most police officers in the city of Boston, denotes an organization of deliveries involving Dominicans, who are the main delivery people for the product of cocaine in and around the city of Boston. It has to do with the deliveries of this drug by automobile and on foot."

In response to a question about what he was on the lookout for on August 2, 1990, Detective Martin testified:

> "There are certain telephones in and around the area of Edward Everett Square that are known to be used by the organization we call Spanish We Deliver."

During cross-examination by defense counsel, Detective Martin, when asked if baggies are a fairly common item, answered: "Involving the ethnic group that we are involved in. Yes sir." He testified further:

> "I can only answer that, again, sir, is that involving different groups, each group has their own way of packaging. And for the people — the ethnic group that we were involved with, it is very common for that ethnic group to bag their cocaine in cut-off baggies . . . . [In response to another question:] Dominicans, in distribution of cocaine, use cut-off baggies very commonly. Certain individuals from other parts of the city of Boston use different packaging for their distribution of the same type of white powder."

The prosecutor found dwelling on ethnic labels equally tantalizing. On redirect, over objection, she asked: "Which group uses the cut-off baggies?" The response from Detective Martin was:

> "It's the common way of street level distribution involving the Spanish We Delivers, which are controlled and operated by the Dominicans."

Asked what he meant by "Dominicans," Martin explained, "They're from Santo Domingo."

One might wish for more vigorous objections and motions to strike by defense counsel to the persistent injection of irrelevant references to the ethnicity of the defendant and the drug operation of which — so the prosecution suggested — the defendant was a part. Counsel did, however, attempt objections when "Spanish We Deliver" and "Dominicans" were introduced as topics of interrogation, and we do not think, as the government suggests, that defense counsel waived objection to the ethnicity line of questions by not persisting in objections that had proved unsuccessful. Nor do we think it a fair argument by the government that defense counsel's own considerable questioning of police witnesses about ethnic patterns constituted an endorsement of the relevance of the government's discussion of ethnicity. At that point, defense counsel was engaged in trying to contest whether the ethnic label had been properly pinned on his client.

Prosecutors "may not appeal to [ethnic or] racial prejudice to obtain a guilty verdict." *Commonwealth* v. *Washington,* 28 Mass. App. Ct. 271, 273 (1990). See also *United States* v. *Vue,* 13 F.3d 1206, 1213 (8th Cir. 1994); *United States* v. *Saccoccia,* 58 F.3d 754, 774 (1st Cir. 1995). That is not a novel principle, but one of old standing. See *Commonwealth* v. *Kazules,* 246 Mass. 564, 566 (1923); *Commonwealth* v. *Graziano,* 368 Mass. 325, 331-333 (1975) ("appeal to popular ethnic stereotypes went beyond permissible limits"). As in *Commonwealth* v. *Mahdi,* 388 Mass. 679, 693 (1983), the references in this case to ethnicity served no apparent purpose other than to play on the fears and possible prejudices of the jury rather than to appeal to the jury's calm consideration of the evidence. See *Commonwealth* v. *Perry,* 254 Mass. 520, 531 (1926); *Commonwealth* v. *Shelley,* 374 Mass. 466, 470 (1978) *S.C.,* 381 Mass. 340 (1980), and 411 Mass. 692 (1992); *Commonwealth* v. *Gallego,* 27 Mass. App. Ct. 714, 717-719 (1989).

There are occasions when references to the ethnicity of persons in a case are relevant. See, e.g., *Commonwealth* v. *Washington,* 28 Mass. App. Ct. at 274 (victim's purported fear of black people was probative of why she did not complain to certain individuals that she had been raped); *United States* v. *Saccoccia,* 58 F.3d at 775 (reference to Colombians, in context, was relevant to a money laundering operation and was not received to suggest that Colombians are prone to violence). Here, however, the government had a solid and routine drug dealing case. The detectives had observed a drug transaction from its inception through its conclusion. Martin had succeeded in actually seeing drugs change hands from seller to buyer. Thereafter, the officers had obtained the fruits of the car search, viz., a sizeable stash of drugs, packaged for street sale in the same fashion as the drug transaction they had just observed and intercepted. The defendant was also carrying $1,400 in cash when arrested.

What the ethnic background of the defendant was, and whether he was a member of a Spanish-speaking drug ring of Dominican background filled in no missing aspect of the

crime charged. The references to ethnic background, in the trial context, could serve no purpose other than to influence the jury to resolve doubts against the defendant because he was a member of a foreign and, thereby, suspect people. The defendant, incidentally, was Spanish speaking[1] and from the Dominican Republic. To an impermissible degree, he was tried for ethnic association rather than for the crime he was accused of having committed. It may be that the underlying prosecution case was a powerful one, but the defendant has a right to a fair trial. See *Commonwealth* v. *Kazules*, 246 Mass. at 566; *United States* v. *Vue*, 13 F.3d at 1213. Lara took the stand and testified that he did not know there were drugs hidden in the car and that he did not participate in a sale of drugs. To be sure, his story required some suspension of disbelief on the jury's part, but to the degree Lara had a chance of having the jury accept his version of events, much depended on what the jury thought about Lara's credibility. That credibility was likely to be impaired by ethnic innuendos. Admission of the improper ethnic references is seldom harmless error. See *Commonwealth* v. *Kazules*, 246 Mass. at 566; *United States* v. *Rodriguez-Cortes*, 949 F.2d 532, 542 (1st Cir. 1991); *United States* v. *Vue*, 13 F.3d at 1213; *United States* v. *Saccoccia*, 58 F.3d at 776. It was not harmless in this case.

*Judgments reversed.*
*Verdicts set aside.*

---

[1]He testified at trial through an interpreter.