In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1494

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JUAN RAMIREZ-FUENTES,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:10 CR 158—**Philip P. Simon**, *Chief Judge.*

ARGUED DECEMBER 6, 2012—DECIDED JANUARY 3, 2013

Before EASTERBROOK, *Chief Judge*, and FLAUM and ROVNER, *Circuit Judges*.

FLAUM, *Circuit Judge*. In August 2010, Juan Ramirez-Fuentes confessed to being responsible for a bag containing 3.1 kilograms of methamphetamine and for two firearms agents found in his brother's apartment. Ramirez-Fuentes was charged with one count of possession with the intent to distribute five hundred grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and one count of possessing firearms in fur-

therance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). A jury convicted Ramirez-Fuentes of committing the charged crimes, and the district court sentenced him to 295 months' imprisonment. On appeal, Ramirez-Fuentes argues that the district court erred in admitting testimony from a government expert witness who described the recovered substance as "Mexican methamphetamine," which he noted is produced by "Mexican nationals," and who addressed the violence associated with drug trafficking. Ramirez-Fuentes also argues that the district court did not meaningfully consider his argument at sentencing that he would be deported after his release from prison and that the sentence imposed by the district court is substantively unreasonable. For the reasons set forth below, we affirm.

## I. Background

### A. Factual Background

On August 23, 2010, Department of Homeland Security Special Agent Marc Zuder, Task Force Agent Lonnie Urban, and several other state and local law enforcement officers were conducting a firearms-related surveillance operation at a trailer park in Hammond, Indiana. During the operation, officers approached Ramirez-Fuentes's trailer and knocked on his door. Ramirez-Fuentes, a Mexican citizen and legal resident of the United States, answered and gave verbal and written consent to the agents to search his trailer. During the course of their search, the agents seized slightly more than $10,000 in

cash, a small amount of marijuana, two handguns, ammunition, three scales, and a box containing a white residue that tested positive for cocaine.

Following the seizures, Agent Zuder and some additional officers went to a market in Hammond where Ramirez-Fuentes's brother, Jamie Ramirez-Fuentes, was operating a food truck. Jamie admitted to the officers that he was in the United States illegally and that he was involved in an illegal firearms trade. Upon the officers' request, Jamie consented to a search of his apartment, and during the search, agents found a bag containing over 3.1 kilograms of methamphetamine, two handguns, and drug paraphernalia.

When the agents completed the search of Jamie's apartment, Agent Zuder confronted Ramirez-Fuentes with the evidence and asked him whose fingerprints would be found on the methamphetamine. Ramirez-Fuentes replied "mine." Later that same evening at the Cook County Sheriff's Department, Ramirez-Fuentes gave a post-*Miranda* oral and written statement, admitting that his friend Luis had paid him $500 to hold onto a bag filled with four to six pounds of methamphetamine, which he hid in Jamie's apartment. He also stated that he gave Jamie the firearms for protection. Finally, Ramirez-Fuentes admitted that he had once delivered a kilogram of cocaine for Luis and that he collected $30,000 during the exchange.

**B. Procedural Background**

On September 15, 2010, a grand jury indicted Ramirez-Fuentes. He was charged with one count of possession with the intent to distribute five hundred grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and one count of possessing firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c).

Ramirez-Fuentes's jury trial began on September 26, 2011. In addition to the agents and officers who participated in the investigation on August 23, the government called Drug Enforcement Administration ("DEA") Special Agent Jon Johnson to provide expert testimony on the manufacture and distribution of methamphetamine and the tools of the drug trade. Specifically, Agent Johnson testified that officers commonly find drugs and guns together because of the potential for theft and the desire of individuals to protect their drugs. Agent Johnson also testified to the difference between "Mexican methamphetamine," which according to Agent Johnson is produced by "Mexican nationals . . . either south of the border or in super labs on the west coast," and homemade methamphetamine produced in small labs in the United States. Agent Johnson opined that the methamphetamine seized from Jamie's apartment was "Mexican methamphetamine," worth approximately $1.25 million. He noted that the large quantity and the purity levels were consistent with "a very upper level distributor." Although Ramirez-Fuentes objected, without success, to the relevance of Agent Johnson's testimony relating to the effects of ingesting methamphetamine, Ramirez-Fuentes

did not object to either the testimony relating to the violence associated with drug trafficking or the testimony relating to "Mexican methamphetamine."

After a three-day trial, the jury convicted Ramirez-Fuentes on both counts. Ramirez-Fuentes's Pre-Sentence Report recommended an advisory guideline range of 235 to 293 months' imprisonment on count one and 60 consecutive months' imprisonment on count two. In his sentencing memorandum, Ramirez-Fuentes argued for the mandatory minimum sentence of fifteen years' imprisonment. He explained that he was living in the United States legally with his wife and children at the time of his arrest and that this was the first non-traffic offense he had committed. He also emphasized that he will be deported and separated from his family when he is eventually released from prison. The district court noted Ramirez-Fuentes's "comprehensive" sentencing memorandum but found nothing in his history and characteristics, including his family situation, that would support the substantial reduction he requested. The district court sentenced Ramirez-Fuentes to 295 months in prison: 235 months on the drug distribution charge and a consecutive 60-month sentence on the firearm possession charge.

## II. Discussion

### A. Agent Johnson's Testimony

Ramirez-Fuentes first challenges the district court's admission of Agent Johnson's testimony relating to the

violence associated with drug trafficking and to the "Mexican" nature of the methamphetamine at issue in this case. He argues that the district court should have excluded the testimony as irrelevant and unfairly prejudicial. Before the district court, however, Ramirez-Fuentes's trial counsel did not object to the admissibility of the evidence at issue on appeal, and unpreserved evidentiary issues must be analyzed under a plain error standard. *United States v. Foster*, 939 F.2d 445, 450 (7th Cir. 1991).

Ramirez-Fuentes contends that his counsel did not need to object to each individual question regarding Agent Johnson's classification of the methamphetamine or the violence associated with drug trafficking because he "lodged a general objection to the government's entire line of questioning." But Ramirez-Fuentes mischaracterizes that objection. In fact, his trial counsel objected only once during Agent Johnson's testimony, arguing that the testimony relating to the effects of ingesting methamphetamine was irrelevant to the issues in the case. Because the objection gave "no indication to the judge that the defense [was] claiming that the entire line of questioning [was] improper," we will review for plain error only. *United States v. McMahan*, 495 F.3d 410, 418 (7th Cir. 2007), *vacated in part on other grounds*, 552 U.S. 1091 (2008).

To prevail under plain error review, a defendant must show "(1) the district court made an error; and (2) that error represented a miscarriage of justice such that [the defendant] probably would have been acquitted but for the erroneously admitted evidence." *Foster*, 939 F.2d at 450-

51 (internal quotation marks omitted). We will remand to avoid a miscarriage of justice if an error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Trujillo-Castillon*, 692 F.3d 575, 578 (7th Cir. 2012) (internal quotation marks omitted).

The Federal Rules of Evidence guide our inquiry into whether the evidence at issue in this case was relevant and admissible. Under Rule 401, evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. Relevant and reliable expert testimony is admissible if it will help the jury understand the evidence in the case. Fed. R. Evid. 702; *see also United States v. Avila*, 557 F.3d 809, 820 (7th Cir. 2009). In the context of drug trafficking cases, this court has consistently allowed expert testimony "concerning the 'tools of the trade' and the methods of operation of those who distribute various types of illegal narcotics" because the average juror is not well versed in the mechanics of the drug trade. *United States v. Allen*, 269 F.3d 842, 846 (7th Cir. 2001) (quoting *United States v. Hubbard*, 61 F.3d 1261, 1274-75 (7th Cir. 1995)). Such evidence may be excluded, however, if the potential for unfair prejudice outweighs the probative value of the evidence. Fed. R. Evid. 403.

### 1. Drug-Trade Violence Testimony

In order to convict Ramirez-Fuentes on the firearm possession count, the government needed to prove that

Ramirez-Fuentes possessed the guns found at Jamie's apartment in furtherance of a drug trafficking crime. *See* 18 U.S.C. § 924(c). In response to the prosecutor's inquiry about whether there was anything "significant about finding guns in close proximity to drugs," Agent Johnson responded:

> That's pretty common for us when we're doing drug search warrants, drug cases. Because drug dealing is a cash business, there's a lot of theft involved. There's a lot of violence. It's—when you're doing drug deals and you get ripped off, it's not like you can call the police and say hey, that guy just stole my pound of meth or stole my $20,000 that I was going [to use] to buy a pound of meth. So there's a lot of violence associated with it and we see a lot of guns with the drugs.

Tr. 145. Although Ramirez-Fuentes contends that this testimony was irrelevant because the government did not charge him with committing any violent act, we disagree. The testimony was directly relevant to whether Ramirez-Fuentes possessed the firearms in furtherance of a drug trafficking crime. It helped the jury understand certain practices of the drug trade and allowed the jury to infer that the firearms were being used to protect the methamphetamine from potential theft.

We find unconvincing Ramirez-Fuentes's argument that the district court should have excluded Agent Johnson's testimony about drug trafficking under Rule 403 because it caused jurors to associate Ramirez-Fuentes with violent behavior. Agent Johnson's discussion of

the relationship between guns and drugs, during which time he referenced the violence that is part of the drug trade, was highly probative of Ramirez-Fuentes's guilt on the firearm possession charge and any potential for prejudice was slight. Ramirez-Fuentes's reliance on *United States v. Smith*, 400 F. App'x 96 (7th Cir. 2010), in support of his argument is misplaced. He asserts that in *Smith*, this court admonished generalized comments linking a defendant to a broader drug trade and the violence associated with that drug trade. But *Smith* is a sentencing case in which the district court recited numerous irrelevant facts outside the record regarding the repercussions of the drug trade in the United States and Mexico. *Id.* at 98-99. In this case, Agent Johnson's only reference to violence came during a discussion about the connection between guns and drugs. And at no point did the government blame Ramirez-Fuentes "for issues of broad local, national, and international scope." *Id.* at 99. Consequently, we find that the district court did not err in allowing Agent Johnson to testify about the violence that leads individuals to use guns to protect their drugs.

### 2. References to Ramirez-Fuentes's Ethnicity

Agent Johnson's testimony regarding the "Mexican" nature of the methamphetamine at issue in this case is far more troubling. The Supreme Court has stated that "[d]iscrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose v. Mitchell*, 443 U.S. 545, 555 (1979) (ad-

dressing the selection of members of a grand jury). Accordingly, this court has explained that the Constitution "prohibits a prosecutor from making race-conscious arguments since it draws the jury's attention to a characteristic that the Constitution generally demands that the jury ignore." *United States v. Hernandez*, 865 F.2d 925, 928 (7th Cir. 1989); *see also Smith v. Farley*, 59 F.3d 659, 663 (7th Cir. 1995) ("There is no place in a criminal prosecution for gratuitous references to race . . . ."). Several other circuit courts have expanded on that principle and have held that the admission of government-proffered testimony tying the race or ethnicity of a defendant to the racial or ethnic characteristics of a specific drug trade is improper. *See, e.g., United States v. Cabrera*, 222 F.3d 590, 594-96 (9th Cir. 2000); *United States v. Vue*, 13 F.3d 1206, 1212-13 (8th Cir. 1994); *United States v. Cruz*, 981 F.2d 659, 663-64 (2d Cir. 1992); *United States v. Doe*, 903 F.2d 16, 20-22 (D.C. Cir. 1990). We agree with those circuits and warn that such testimony runs a serious risk of prejudicing a defendant in the eyes of the jury.

In *Cabrera*, the Ninth Circuit reversed two defendants' convictions for crack cocaine offenses because a detective testifying at the trial repeatedly injected impermissible references to the defendants' national origin. *Cabrera*, 222 F.3d at 594-97. During his testimony, the detective made several comments about the drug activity among "Cubans" in the defendants' neighborhood. *Id.* at 591-92. He also explained that the drugs purchased from the defendants were packaged in flat wafers, which is a type of packaging common among Cuban drug dealers. *Id.* at 592. Finally, the detective

indicated that Cubans tend to be flight risks. *Id.* at 593. The Ninth Circuit concluded that even if the testimony about the cocaine packaging was relevant to an issue in the case, the references to the defendants' national origin were unfairly prejudicial under Rule 403. *Id.* at 596. In reversing the defendants' convictions under plain error review, the court emphasized that "[t]he fairness and integrity of criminal trials are at stake if we allow police officers to make generalizations about racial and ethnic groups in order to obtain convictions. People cannot be tried on the basis of their ethnic backgrounds or national origin." *Id.* at 597.

More recently, the Ninth Circuit considered a case in which a DEA agent testified about the roles of "Middle Easterners" and "Mexicans" in the production of methamphetamine. *United States v. Nobari*, 574 F.3d 1065, 1072 (9th Cir. 2009). The defendants in the case, who were of either Middle Eastern or Mexican descent, had been charged in a methamphetamine conspiracy. *Id.* at 1070. In response to questions from the prosecution, the agent indicated that individuals of Middle Eastern descent are responsible for bringing pseudoephedrine into the United States from Canada and that Mexican individuals are responsible for cooking the methamphetamine. *Id.* at 1072. The prosecution posed similar questions about the roles of certain ethnic groups to an informant who was called as a witness by the defense. *Id.* at 1071-72. The day after these witnesses testified, the defense attorney moved to strike the testimony containing ethnic generalizations. *Id.* at 1072. Instead, the court gave the jury an instruction not to consider a

person's ethnicity in determining whether he or she was likely to have engaged in criminal activity. *Id.* Despite this instruction, however, the prosecution returned to the ethnic generalizations during closing, emphasizing the importance of the roles in the manufacturing of methamphetamine. *Id.* at 1073. The Ninth Circuit concluded that any potential probative value of the ethnic generalization testimony was substantially outweighed by the danger of unfair prejudice. *Id.* at 1075. The court found that the district court had abused its discretion by admitting the testimony and allowing the prosecutor to reference the testimony during closing argument, but it ultimately found the error to be harmless. *Id.* at 1083.

The Second, Eighth, and D.C. Circuits have also held that the introduction of evidence connecting the race or ethnicity of a defendant to racial or ethnic generalizations about a particular drug trade is improper. In *Cruz*, a case involving Hispanic defendants, the Second Circuit held that the district court erred in admitting a DEA agent's description of the neighborhood in which the drug transactions at issue allegedly took place. *Cruz*, 981 F.2d at 663-64. The agent had described the area as "inundated with drug dealing" and stated that it had "a very high Hispanic population." *Id.* at 664. The Second Circuit concluded that the "[i]njection of a defendant's ethnicity into a trial as evidence of criminal behavior is self-evidently improper and prejudicial for reasons that need no elaboration here." *Id.* Similarly, in *Vue*, the Eighth Circuit determined that the district court erred in admitting a customs official's testimony that Hmong individuals were responsible for 95 percent of the opium smuggled into the Twin Cities in a case involving

Hmong defendants. *Vue*, 13 F.3d at 1212-13. Finally, in holding the admission of a detective's detailed description of the Jamaican drug trade in a case involving Jamaican defendants to be impermissible, the D.C. Circuit emphasized that "[i]t is much too late in the day to treat lightly the risk that racial bias may influence a jury's verdict in a criminal case." *Doe*, 903 F.2d at 21.

Here, Agent Johnson made unnecessary and avoidable references to Ramirez-Fuentes's nationality in response to questions from the prosecution. In describing how methamphetamine is manufactured, Agent Johnson stated:

> There's two different types of methamphetamine that we see here in the United States. One is what we call . . . Mexican methamphetamine because it's made by Mexican nationals. Typically, either south of the border in Mexico or in super labs on the west coast like in California. The other kind of methamphetamine that we see is, for lack of a better term, homemade methamphetamine. And that's the stuff that is made in small labs, box labs we call them sometimes, that you can make it in your kitchen using . . . pseudoephedrine or pseudophed.

Tr. 140. The prosecutor then asked Agent Johnson whether the bags of methamphetamine in front of him fit the description of "Mexican methamphetamine" or homemade methamphetamine. *Id.* at 141. Agent Johnson replied, "[t]hat appears to be Mexican methamphetamine." *Id.*

Although the government contends that the "Mexican methamphetamine" testimony was relevant to whether

Ramirez-Fuentes possessed the methamphetamine with the intent to distribute, we do not see the connection. At no point during his testimony did Agent Johnson state that "Mexican methamphetamine" is the only type of methamphetamine produced for distribution or the most common type of methamphetamine distributed in the United States. Moreover, Agent Johnson testified separately to the quantity and purity of the recovered methamphetamine. If the distinction between the two types of methamphetamine was important to the discussion of quantity or purity, which is something the government has been unable to establish,[1] then Agent Johnson could have just as easily removed his reference to "Mexican methamphetamine" and "Mexican nationals" and testified that in his opinion, the type of methamphetamine at issue in this case was of a type generally produced in large quantities in "super labs" rather than in small, box labs using pseudoephedrine. *See Cabrera*, 222 F.3d at 596 (discussing the ease with which the testifying officer could have removed the reference to the defendants' ethnicity in order to "maintain[ ] the statement's probative value and eliminat[e] its prejudicial effect"). But the fact that the methamphetamine at issue is classified as "Mexican" or that it

---

[1] During oral argument, we asked the attorney for the government whether there was any chemical distinction between "Mexican methamphetamine" and the type of methamphetamine that is produced in small, box labs. The attorney responded that she did not know if there was anything chemically different about "Mexican methamphetamine."

may have been produced by "Mexican nationals" did nothing to show that Ramirez-Fuentes possessed the methamphetamine with the intent to distribute.

Instead, the references to "Mexican methamphetamine" invited the jury, albeit implicitly, to consider Ramirez-Fuentes's nationality in reaching its decision in the case. The jury could have consciously or subconsciously found it more likely that Ramirez-Fuentes, a Mexican citizen, would have possessed the methamphetamine with the requisite intent because of Agent Johnson's suggestion that "Mexican nationals" produce methamphetamine for distribution. Our cases have made clear that a jury cannot consider a defendant's race, ethnicity, or national origin in reaching a verdict. *See, e.g.*, *Hernandez*, 865 F.2d at 928; *Smith*, 59 F.3d at 663. Thus, even if the evidence was at all relevant under Rule 401, it should have nonetheless been excluded under Rule 403 because of the danger of unfair prejudice inherent in its admission.

### 3. Probability of Acquittal

Although we are disturbed by Agent Johnson's improperly admitted testimony linking Ramirez-Fuentes's nationality to the methamphetamine at issue in this case, we cannot grant Ramirez-Fuentes's request for a new trial. Under plain error review, Ramirez-Fuentes must show probable acquittal but for the district court's error. *United States v. Sebolt*, 460 F.3d 910, 918 (7th Cir. 2006). This he cannot do. At trial, Ramirez-Fuentes's own confession, which was corroborated by testimony from

investigating agents, provided overwhelming evidence of his guilt. When confronted with the evidence, Ramirez-Fuentes told Agent Zuder that the agents would find his fingerprints on the bag of methamphetamine that they recovered at his brother's apartment. After being informed of his *Miranda* rights, he explained that his friend Luis had given him $500 in exchange for holding onto a bag filled with four to six pounds of methamphetamine. Ramirez-Fuentes stated that he hid the bag in Jamie's apartment and gave Jamie the firearms for protection. He also admitted that he had once delivered cocaine for Luis and that he had collected $30,000 for the cocaine on delivery.[2] Because of the overwhelming evidence of his guilt, we simply cannot conclude that the jury probably would have acquitted Ramirez-Fuentes but for the admission of the references to "Mexican methamphetamine." Consequently, we hold that the district court's admission of Agent Johnson's testimony did not constitute plain error in this case.

## B.  Reasonableness of the Sentence Imposed

Ramirez-Fuentes also argues that the district court did not meaningfully consider his argument in mitigation

---

[2]  Although the evidence of the cocaine transaction is evidence of another crime, at trial, the district court instructed the jury that the evidence of the $30,000 transaction is relevant only to whether Ramirez-Fuentes committed the charged offense with the requisite mental state, and Ramirez-Fuentes did not object to the admission of the testimony either at trial or on appeal.

at sentencing regarding his likely deportation following his release from prison. He further contends that his sentence is substantively unreasonable in light of his history and characteristics. We review de novo whether the district court committed procedural error, which includes determining whether the district court properly considered the factors in 18 U.S.C. § 3553(a) and any mitigating evidence offered by the defendant. *United States v. Vallar*, 635 F.3d 271, 277-78 (7th Cir. 2011). Next, we review the substantive reasonableness of the defendant's sentence under an abuse of discretion standard, presuming that a sentence within the defendant's guideline range is substantively reasonable. *United States v. Freeman*, 691 F.3d 893, 902 (7th Cir. 2012).

### 1. Consideration of Ramirez-Fuentes's Principal Sentencing Arguments

When imposing a sentence, a district court must provide an adequate explanation for the sentence that reflects a meaningful consideration of the factors listed in § 3553(a). *United States v. Mendoza*, 576 F.3d 711, 721 (7th Cir. 2009). This court has repeatedly stated, however, that this obligation does not require a comprehensive discussion of each of those factors. *United States v. Villegas-Miranda*, 579 F.3d 798, 801 (7th Cir. 2009). Because defendants often raise "stock arguments that sentencing courts see routinely," we have held that "a sentencing court is certainly free to reject [those arguments] without discussion." *United States v. Tahzib*, 513 F.3d 692, 695 (7th Cir. 2008). Accordingly, "we regularly

affirm sentences where the district judge does not explicitly mention each mitigation argument raised by the defendant." *United States v. Paige*, 611 F.3d 397, 398 (7th Cir. 2010); *see also Villegas-Miranda*, 579 F.3d at 801 (explaining that a sentencing court must "address all of a defendant's principal arguments that are not so weak as to not merit discussion" (internal quotation marks omitted)).

Although a sentencing court can, in its discretion, take into account a defendant's status as a deportable alien, *see, e.g.*, *United States v. Panaigua-Verdugo*, 537 F.3d 722, 728 (7th Cir. 2008), it need not take into account those arguments that are frivolous or, in the context of the case, "stock" arguments without specific application to the defendant, *United States v. Mendoza*, 576 F.3d 711, 722 (7th Cir. 2009). In *Mendoza*, the defendant, a lawful permanent resident of the United States, argued that following his release from prison, he would be "forever separated from his children wh[o] are United States citizens."[3] *Id.* at 721. He argued that deportation should

---

[3] After the defendant's attorney made this comment at sentencing, the district judge stated, "The defendant's going to be deported, in any event, so how does deportation factor into the sentencing decision that I have to make? . . . He's going to receive some prison sentence. As a result of that he's going to be deported." *Mendoza*, 576 F.3d at 721. Ramirez-Fuentes highlights this comment as the distinguishing factor between the district court's treatment of the defendant's deportation argument in *Mendoza* and the district court's treatment of his deportation argument in this case. He suggests that it was

(continued...)

factor into sentencing because if he were released sooner, he would have a better chance of readjusting to life in Mexico, which would lessen his temptation to return illegally to the United States. *Id.* In addressing the defendant's contention that the district court passed over this argument without discussion, we explained that it was nothing more "than a stock argument that is routinely, and increasingly made to the district courts" and emphasized that "it does not seem that Mendoza would be alone in claiming that deportation would separate him from his family." *Id.* at 722. We concluded that the deportation argument "was not a substantial one requiring discussion by the district court." *Id.*

Here, Ramirez-Fuentes argued at several different points in his sentencing memorandum and during the sentencing hearing that he should receive a lighter sentence because he would almost certainly be deported following his release. He emphasized that deportation would cause him to be separated from his wife and from his children, who are United States citizens. His attorney stated during sentencing that even if the court were to impose a sentence of 15 years' imprisonment, it would

---

[3] (...continued)

clear that the district court in *Mendoza* had considered the defendant's deportation argument, but that in this case, the district court did not make even a passing mention of deportation. In concluding that the district court did not err by not addressing Mendoza's deportation argument, however, we did not consider the fact that the district court had mentioned deportation, and instead held that the argument did not "requir[e] explicit discussion by the district court. *Id.* at 722.

ultimately be "a life sentence away from his family" because of his certain deportation.

Although the district judge did not explicitly discuss his consideration of Ramirez-Fuentes's deportation argument, he nevertheless demonstrated that he gave meaningful consideration to the factors in § 3553(a) and to the claims that merited comment. In addressing the possibility of mitigation, the judge discussed the modesty of Ramirez-Fuentes's criminal history, his contributions to his family, and his employment history. The judge pointed out that Ramirez-Fuentes was married with a child but stated that he found Ramirez-Fuentes's family circumstances to be "unremarkable." In explaining the appropriateness of a sentence within the guidelines, the judge emphasized how troubled he was by the nature and circumstances of the offense. He noted that Ramirez-Fuentes possessed more than twice the maximum amount of methamphetamine considered under the guidelines and that the drugs were stored with loaded guns. Finally, the judge mentioned his dissatisfaction with Ramirez-Fuentes's elocution in court, explaining that he placed the blame on the agents rather than taking responsibility for the crime. Although the judge did not proceed in a checklist fashion through each one of the § 3553(a) factors, his discussion reflected that he had considered each of the factors in determining an appropriate sentence.

### 2. Substantive Reasonableness of the Sentence

Ramirez-Fuentes's argument that the sentence imposed by the district court is substantively unreasonable lacks

merit. A sentence that falls within a properly calculated guideline range is presumed reasonable. *Freeman*, 691 F.3d at 902. Ramirez-Fuentes concedes that the district court properly calculated his guideline range and that his sentence is within that range, but he maintains that 295 months' imprisonment is an unreasonably long sentence under the circumstances because he has never spent a day in custody, because he worked and supported his family, and because he will ultimately be deported.

These arguments are insufficient to overcome the presumption of reasonableness in this case. As noted above, the district court thoroughly considered Ramirez-Fuentes's arguments as well as the relevant § 3553(a) factors. Although the judge did not explicitly discuss his consideration of the deportation argument, he specifically mentioned that he had considered Ramirez-Fuentes's family circumstances. The judge weighed heavily the seriousness of the offense, as evidenced by the large quantity of methamphetamine, the purity of the drugs, the large quantity of currency that agents seized, the evidence that Ramirez-Fuentes had engaged in at least one prior drug deal, and the use of firearms in furtherance of the drug trafficking. Recognizing the need for the sentence to reflect the seriousness of the offense and to promote respect for the law, the judge imposed a sentence at the low end of Ramirez-Fuentes's guideline range. We see no reason to overturn the district court's presumptively reasonable sentence.

### III. Conclusion

For the foregoing reasons, we AFFIRM the jury's verdict and the sentence imposed by the district court.