**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-4370**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

     v.

ALEJANDRO GARCIA-LAGUNAS, a/k/a Alex Fuentes,

        Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. James C. Fox, Senior District Judge. (5:12-cr-00376-F-1)

Argued: September 17, 2015      Decided: February 19, 2016

Before DUNCAN and DIAZ, Circuit Judges, and DAVIS, Senior Circuit Judge.

Affirmed in part, vacated in part, and remanded by unpublished opinion. Judge Diaz wrote the opinion, in which Judge Duncan joined. Senior Judge Davis wrote a dissenting opinion.

**ARGUED**: Paul K. Sun, Jr., ELLIS & WINTERS, LLP, Raleigh, North Carolina, for Appellant. Kristine L. Fritz, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF**: Thomas G. Walker, United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

A jury convicted Alejandro Garcia-Lagunas of conspiracy to distribute cocaine and possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a), 846. He was sentenced to 188 months' imprisonment. On appeal, Garcia-Lagunas challenges his conviction, arguing that he was deprived of a fair trial because of several evidentiary errors, including the introduction of ethnically charged evidence. He also challenges his sentence on several grounds, including that the district court miscalculated the U.S. Sentencing Guidelines (the "Guidelines") range. For the reasons that follow, we affirm Garcia-Lagunas's conviction, vacate his sentence, and remand for resentencing.

I.

"On appeal from a criminal conviction, we recite the facts in the light most favorable to the government." United States v. Washington, 743 F.3d 938, 940 (4th Cir. 2014).

A.

On March 27, 2012, Ronnie Reed was arrested in Fayetteville, North Carolina on federal drug trafficking charges. Reed told the law enforcement officers that he had a "Mexican drug supplier" named "Alex." J.A. 92. Reed led the officers to three trailers in Robeson County—at 33 Sonoma, 47

3

Sonoma, and 294 Maple Leaf—where he said he had purchased drugs from "Alex." Reed also gave the officers four telephone numbers that he had previously used to contact "Alex."

The next day, the police simultaneously executed search warrants on the three trailers. The officers found Garcia-Lagunas's parents at 33 Sonoma and ten kilogram wrappers buried in a lean-to shed behind the trailer at 47 Sonoma. At 294 Maple Leaf, officers followed a vehicle that left that location to a trailer at 353 Westcott. Detective Kurt Stein observed Marco Hernandez exit the 353 Westcott trailer from the back, and Detective Pedro Orellano and Sergeant Gregory Johnson approached him. Orellano confirmed that Hernandez lived at the trailer and obtained his consent to search it.

The officers found Garcia-Lagunas and Brian Jacobs inside the trailer. Garcia-Lagunas had white powder under his nose and appeared "impaired" to Detective Orellano. J.A. 248. Garcia-Lagunas identified himself to the officers as Alex. Both Garcia-Lagunas and Jacobs told the officers that they did not live in the trailer. After Sergeant Johnson asked him to empty his pockets, Garcia-Lagunas produced $600 cash and a cell phone. When Detective Stein dialed one of the phone numbers Reed had given the police for "Alex," Garcia-Lagunas's phone rang. Later analysis of the phone's records connected it to several known drug dealers.

4

The officers searched the trailer.  In the kitchen, they found a handgun and several small baggies about one inch by one inch in size.  In one bedroom, the officers found body armor; a large digital scale; a small digital scale; a black plastic bag containing a vacuum-sealed bag, which in turn contained about 800 grams of a white powder; and a small baggie of crack cocaine.  The white powder field-tested positive for cocaine, but later State Bureau of Investigation ("SBI") laboratory tests revealed that the powder contained no controlled substance.

B.

A grand jury charged Garcia-Lagunas[1] with conspiring to distribute and possess with the intent to distribute 500 grams of cocaine, in violation of 21 U.S.C. §§ 841(a), 846, and unlawfully reentering the United States after having previously been deported, in violation of 8 U.S.C. § 1326(a).  He pleaded guilty to the unlawful reentry charge and proceeded to trial on the conspiracy charge.

Before trial, the government gave notice of its intention to call Detective Shawn Collins as an expert witness, stating that he would "testify about drug trafficking investigations and methods utilized by drug traffickers to operate and protect their drug business."  J.A. 32.  The district court also agreed

---

[1] Garcia-Lagunas was indicted under the name Alex Fuentes.

5

to provide Garcia-Lagunas with a Spanish interpreter for the proceedings.

Collins was the government's first witness, testifying both as an expert and as an officer who had participated in the investigation and the relevant searches. After hearing testimony about Collins's training and experience, the district court ruled that Collins could testify as an expert in the field of narcotics investigations.

According to Collins, the white powder could have field-tested positive for cocaine and still have been found to contain no controlled substance in SBI's laboratory analysis if someone had added an excessive amount of cutting agent to the cocaine, such that "when the lab sampled a small amount of that 800 grams of cocaine there . . . wasn't enough cocaine in it to even register with the SBI or the instruments they were using." J.A. 111.

Collins also told the jury that Garcia-Lagunas was "an alien illegally in the United States." J.A. 150. After the prosecution asked Collins if he saw that Garcia-Lagunas was "being assisted with the help of an interpreter" in court, Collins testified that his informants had not indicated that they had needed to use Spanish in their dealings with Garcia-Lagunas. J.A. 150-51. Moreover, Collins testified that Garcia-Lagunas "appeared to be fluent in English." J.A. 151.

6

Four drug dealers—Reed, Jacobs, Thomas Brewington, and Antonio Locklear—each testified pursuant to plea agreements to having bought cocaine from Garcia-Lagunas. They each said that they had spoken to Garcia-Lagunas in English. They also testified that they did not know each other. Hernandez, the owner of the trailer at 353 Westcott, testified, also pursuant to a plea agreement, that Garcia-Lagunas had been staying in the room in which the body armor and scales had been found for about four weeks leading up to the arrest.

Detective Orellano testified about his participation in the relevant searches and the evidence that he and Stein found in the 353 Westcott trailer. During its cross-examination of Orellano, the defense elicited testimony regarding the relatively squalid state of Garcia-Lagunas's living conditions. On redirect, Orellano told the jury that he had extensive experience investigating "Hispanic drug traffickers," and that "they're very modest living" because "they send the majority if not all the proceeds back to their native countries." J.A. 270. Defense counsel objected. Asked to explain the relevance of Orellano's testimony, the government said that it rebutted the defense's implied argument "that it would be impossible for the defendant to have dealt these large amounts of cocaine and taken in this large amount of money because he's living in relatively low level conditions." J.A. 271. Defense counsel responded

7

that Orellano had not been qualified as an expert. After confirming that Orellano's testimony was based on his training and experience, the district court overruled the objection.[2] The government referred to this testimony during its closing argument to explain Garcia-Lagunas's lack of an "extravagant lifestyle." J.A. 520.

Several other officers testified for the government. Relevant to this appeal, Detective Matthew Taylor testified that based on his training and experience, the type of baggies he found in the kitchen at 353 Westcott were "mostly used for the repackaging and sale of narcotics." J.A. 411. Detective Stein testified, based on his training and experience, that the vacuum-sealed bag containing the 800 grams of white powder was of the type frequently used by drug traffickers "to seal in the odor of the narcotics so that they're harder to be detected [and] easier to transport." J.A. 437-38.

The court chose (without objection from the parties) not to submit a special verdict sheet for the jury to indicate the

---

[2] After defense counsel renewed his objection, the court at a bench conference stated: "I'm not quite sure what the relevance of all of this is, but I do know, based on my experience, that most Latins send money home whether they're drug dealers or not." J.A. 273. Garcia-Lagunas contends that the court's statement emboldened the government to engage in ethnic stereotyping. While the court's comment is puzzling at best, we do not address it further because the jury did not hear it.

amount of cocaine Garcia-Lagunas was responsible for within the conspiracy, finding it sufficient that the verdict form specifically referenced the indictment. The jury found Garcia-Lagunas guilty of conspiring to distribute and possess with intent to distribute 500 grams or more of cocaine. After the verdict, the court sua sponte directed the parties to brief whether it erred by failing to instruct the jury to find the amount of cocaine individually attributable to Garcia-Lagunas, as required by United States v. Collins, 415 F.3d 304 (4th Cir. 2005). However, it ultimately ruled that no Collins error had occurred.

The presentence investigation report (the "PSR") found Garcia-Lagunas responsible for 39 kilograms of cocaine and 16 grams of crack cocaine, resulting in a base offense level of 34. The PSR added three two-level enhancements for possession of a dangerous weapon, threatening or directing the use of violence, and obstruction of justice, resulting in a total offense level of 40. The PSR also found Garcia-Lagunas had a criminal history score of zero, putting him in criminal history category I. Garcia-Lagunas objected to the drug weight calculation and the three enhancements.

The district court overruled Garcia-Lagunas's objections to the drug weight calculation and the dangerous weapon enhancement, but sustained the objections to the other two

enhancements, resulting in an offense level of 36. An offense level of 36 coupled with criminal history category I yielded a Guidelines range of 188 to 235 months' imprisonment. The government stated, however, that it would agree to a "two level downward variance based upon the Attorney General's recent directive that is related to the proposed amendment to the Guidelines, specifically the drug quantity base offense levels in the Guideline that may end up being a two level drop for each drug quantity," provided that Garcia-Lagunas agreed not to later seek a variance for the same reason. J.A. 678-79. Garcia-Lagunas so agreed, and the district court stated its intent "to go down the two levels." J.A. 679-80.

The resulting offense level of 34 yielded a Guidelines range of 151 to 188 months' imprisonment. The district court then sentenced Garcia-Lagunas to 188 months' imprisonment while stating it was "impos[ing] a sentence at the low end of the range because this constitutes the defendant's first felony conviction." J.A. 680-81, 683. The court also sentenced Garcia-Lagunas to a consecutive sentence of 24 months' imprisonment for his unlawful reentry conviction. Only after announcing the sentence did the court allow Garcia-Lagunas to allocute.

II.

Garcia-Lagunas first challenges several of the district court's evidentiary rulings. We review those rulings for abuse of discretion, and subject them to harmless error review. United States v. Johnson, 617 F.3d 286, 292 (4th Cir. 2010). An error is harmless when this court is able to conclude, "after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." Id. (quoting United States v. Brooks, 111 F.3d 365, 371 (4th Cir. 1997)). But we may disregard a constitutional error only if we are "able to declare a belief that it was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967).

Where a defendant fails to timely object to an evidentiary ruling, however, we review for plain error. United States v. Keita, 742 F.3d 184, 189 (4th Cir. 2014). To make out a plain error, "the defendant must show 'there was an error, the error was plain, and the error affected [the defendant's] substantial rights.'" Id. (alteration in original) (quoting United States v. Boykin, 669 F.3d 467, 470 (4th Cir. 2012)).

Garcia-Lagunas contends that (1) the admission of evidence regarding Hispanic drug traffickers denied him due process and equal protection, (2) the district court allowed improper opinion testimony from several of the government's lay

11

witnesses, (3) the district court improperly allowed Collins to testify as an expert witness in spite of the government's failure to comply with expert disclosure requirements, and (4) the admission of evidence regarding Garcia-Lagunas's immigration status and use of an interpreter was plain error. We consider each challenge in turn.

A.

1.

Garcia-Lagunas contends that his Fifth Amendment guarantees of due process and equal protection were violated by Orellano's ethnicity-based testimony, which the government used to create an adverse inference against him. Alternatively, he argues that even if the admission and repetition of this testimony in the government's closing argument did not violate his constitutional rights, the evidence nonetheless was improperly admitted expert testimony delivered by a lay witness.

Garcia-Lagunas objected to this testimony at trial, arguably on the improper-expert-testimony ground only. See Fed. R. Evid. 103(a)(1)(B). Nonetheless, the government at oral argument granted that, because of the troubling nature of the error, we should review both contentions for harmless error. Oral Argument at 22:17–23:10, United States v. Garcia-Lagunas, No. 14-4370 (Sept. 17, 2015), available at http://coop.ca4.uscourts.gov/OAarchive/mp3/14-4370-20150917.mp3.

12

While we are not bound by the government's concession, Pisano v. Strach, 743 F.3d 927, 936 n.13 (4th Cir. 2014), we choose to apply harmless error here as it does not affect the outcome.

2.

There is no dispute that "[a]ppeals to racial, ethnic, or religious prejudice during the course of a trial violate a defendant's Fifth Amendment right to a fair trial." United States v. Cabrera, 222 F.3d 590, 594 (9th Cir. 2000); accord United States v. Runyon, 707 F.3d 475, 494 (4th Cir. 2013) ("The Supreme Court has long made clear that statements that are capable of inflaming jurors' racial or ethnic prejudices 'degrade the administration of justice.'" (quoting Battle v. United States, 209 U.S. 36, 39 (1908))).

Where the government injects ethnicity into a trial in a manner that "invite[s] the jury to put [a defendant's] racial and cultural background into the balance in determining their guilt," constitutional error occurs.[3] United States v. Vue, 13

---

[3] As the dissent correctly notes, the government here concedes constitutional error. While we do not lightly ignore that concession, neither are we bound by it. See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."); United States v. Robinson, 460 F.3d 550, 558 n.7 (4th Cir. 2006) ("[O]ur judicial obligations compel us to examine independently the errors (Continued)

13

F.3d 1206, 1213 (8th Cir. 1994); see also United States v. Cruz, 981 F.2d 659, 664 (2d Cir. 1992) ("Injection of a defendant's ethnicity into a trial as evidence of criminal behavior is self-evidently improper and prejudicial for reasons that need no elaboration here.").

Several of our sister circuits have held that "the introduction of evidence connecting the race or ethnicity of a defendant to racial or ethnic generalizations about a particular drug trade is [constitutional error]." United States v. Ramirez-Fuentes, 703 F.3d 1038, 1045 (7th Cir. 2013) (citing Cruz, 981 F.2d at 663-64; Vue, 13 F.3d at 1212-13; and United States v. Doe, 903 F.2d 16, 21 (D.C. Cir. 1990)). We accept that these circuits correctly applied the law, but find that the government's use of an ethnic stereotype here, while regrettable, is materially distinguishable.

In each of the cases where our sister circuits have found constitutional error surrounding the use of ethnically based evidence, the government's argument was, fundamentally, that a certain ethnic or national group was a major participant in the drug trade, that the defendant belonged to that ethnic or

confessed." (alteration in original) (quoting Young v. United States, 315 U.S. 257, 258-59 (1942))).

14

national group, and that the defendant was therefore more likely to be a drug dealer.

For example, in Doe, the government presented an expert witness who testified that "'[t]he Jamaicans . . . have had a phenomen[al] impact on the drug trade in the District of Columbia,' and the market 'has been taken over basically by Jamaicans,'" where there was reason to believe that the government's key witness, an American, owned the incriminating evidence attributed to the Jamaican defendants. 903 F.2d at 18, 28 (second alteration in original) (footnote omitted). The D.C. Circuit ruled that this testimony was inadmissible because it "strongly suggested that appellants were guilty because two of them are Jamaican." Id. at 20–23.

Similarly, in Vue, the government introduced a custom official's testimony that 95% of opium smuggling cases in the Twin Cities area "related to Hmong individuals." 13 F.3d at 1211–12. The Eighth Circuit held that the introduction of such testimony violated the Hmong defendants' constitutional rights "because the injection of ethnicity into the trial clearly invited the jury to put the Vues' racial and cultural background into the balance in determining their guilt." Id. at 1213; see also Cabrera, 222 F.3d at 596 ("[H]ighlighting the ethnicity of the other Cuban drug dealers under investigation at the time was not relevant . . . ; the reference merely made it seem more

15

likely in the eyes of the jury that [the defendants] were drug dealers because of their ethnicity.").

Here, in contrast, the government did not ask the jury to put Garcia-Lagunas's ethnicity on the side of the scale indicating guilt by stating or implying that a defendant of Hispanic descent is more likely to be involved in the drug trade. Put another way, it did not try to inflame any jury prejudice against Hispanic defendants by tying Hispanic identity to a propensity for criminality. Rather, as the government now concedes,[4] it inappropriately relied on an ethnically based generalization to refute Garcia-Lagunas's suggestion that he was too poor to be a major drug dealer.[5]

---

[4] The government nonetheless denies that its use of such evidence was reversible error.

[5] The government's brief directs our attention to United States v. Khan, 787 F.2d 28 (2d Cir. 1986). In Khan, the defendant, a Pakistani man, "attempted to rebut the government's portrayal of him as a major drug dealer by suggesting that he was a poor man." 787 F.2d at 34. The government responded by introducing an expert who testified, in part, that "heroin dealers in Pakistan, like all Pakistanis, [wear] the same national dress-pantaloon, baggy pants, and a knee length top." Id. The Second Circuit found that the testimony was relevant and not unduly prejudicial because it explained that "even if [the defendant] had made a great deal of money in the heroin trade, it would not necessarily show from the manner of his dress." Id.

Khan does not help the government here. First, the government's witness in Khan was testifying as an expert. Second, Khan lived in Pakistan, so the testimony could fairly be understood to be about a cultural practice in the country, (Continued)

16

This use of stereotype was particularly inapt because of the lack of evidence that Garcia-Lagunas himself was sending significant money anywhere. The record shows that since 1988, Garcia-Lagunas has spent the great majority of his time in the United States. While he does have two children living in Mexico, he also has two children living in this country, and at the time of his arrest his parents lived next door to him. Thus, the government's only "evidence" that Garcia-Lagunas was remitting money was its generalization about Hispanic drug traffickers.

Nonetheless, although the government made improper use of an ethnic stereotype, it did not encourage the jury to consider Garcia-Lagunas's ethnicity as evidence of his guilt. Accordingly, we find no constitutional violation, although we also conclude that the evidence was irrelevant. Testing the evidentiary error for harm, however, we find none.

Here, the "over-arching issue at trial" was whether Garcia-Lagunas conspired to deal in large quantities of cocaine, not what he did with any proceeds he made. United States v. Cole, 631 F.3d 146, 155 (4th Cir. 2011). Significant evidence

rather than a generalization about how a certain ethnicity or nationality behaves. Finally, the testimony in Khan was about a readily observable practice.

17

supported the jury's finding that he did so conspire. At trial, four witnesses who did not know each other testified consistently to their dealings with Garcia-Lagunas. See United States v. Briley, 770 F.3d 267, 277 (4th Cir. 2014) (finding evidentiary error harmless where "[a]n array of witnesses gave clear, compelling, and consistent accounts about [the defendant's] actions"), cert. denied, 135 S. Ct. 1844 (2015); cf. Johnson, 617 F.3d at 295 (finding erroneous admission of a DEA agent's testimony as a lay witness was not harmless where the only direct evidence linking the defendant to the charged crime was the testimony of one codefendant that was contradicted by another codefendant's testimony). In addition, when Garcia-Lagunas was arrested, he had white powder on his nose, $600 in cash, and was near a handgun. In his room, the police found 800 grams of a white powder substance, two digital scales, and body armor. Bags used for drug dealing were also found at locations associated with Garcia-Lagunas. Finally, his phone number, which matched that of Reed's source of supply, "Alex," was connected to several known drug dealers.

On this record then, "[w]e can say, 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole,' that the jury's consideration was not 'substantially swayed'" by Orellano's testimony. Briley, 770 F.3d at 278 (quoting Kotteakos v. United States, 328

18

U.S. 750, 765 (1946)).[6]  We therefore find no cause to reverse based on the error.

                              B.

We next address Garcia-Lagunas's argument that the district court erred in admitting evidence regarding his immigration status and use of an interpreter at trial.  Because the defense failed to timely object at trial, we review for plain error.

Evidence of a crime or wrong is not admissible to prove a defendant's bad character in order to show that he acted in accordance with that character.  Fed. R. Evid. 404(b)(1).  Such evidence may be admissible, however, "for another purpose, such as proving . . . identity."  Id. 404(b)(2).  Under Rule 404(b), we use a four-part test to assess admissibility: "(1) the prior-act evidence must be relevant to an issue other than character, such as intent; (2) it must be necessary to prove an element of the crime charged; (3) it must be reliable; and (4) . . . its probative value must not be substantially outweighed by its prejudicial nature."  United States v. Lespier, 725 F.3d 437, 448 (4th Cir. 2013) (quoting United States v. Queen, 132 F.3d 991, 995 (4th Cir. 1997)).

---

[6] Garcia-Lagunas also alleges that Detective Orellano should not have been permitted to testify to the practices of Hispanic drug traffickers because he was not testifying as an expert. Having determined that Orellano's testimony was irrelevant but harmless, we do not address this separate objection.

19

1.

The government presented evidence that Garcia-Lagunas was an alien illegally in the United States. The government argues that this was relevant to Garcia-Lagunas's identity. At trial, the officers explained that "they learned that a Mexican man going by the name 'Alex' was a significant source of cocaine in Cumberland and Robeson Counties." Appellee's Br. at 42. According to the government, Garcia-Lagunas's immigration status was thereby relevant as evidence that he was "Alex." We do not agree.

Collins testified solely that "[t]he defendant was previously deported from the United States and is an alien illegally in the United States right now." J.A. 150. This testimony has almost no probative value concerning Garcia-Lagunas's Mexican nationality; it establishes only that he is not a United States citizen. We reject the notion that an individual's status as an illegal alien, without more, creates an inference of Mexican nationality. And, importantly, the government could easily have shown that Garcia-Lagunas was from Mexico without highlighting his immigration status. See Fed. R. Evid. 404(b) advisory committee's note ("The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof . . . ."). Because the probative value of

20

Garcia-Lagunas's immigration status, especially without reference to his country of citizenship, was so low, we find that it was substantially outweighed by its prejudicial nature. It was not, therefore, permissible 404(b) evidence. See Lespier, 725 F.3d at 448.

Garcia-Lagunas's evidentiary challenge, however, fails on plain error review. "To be 'plain,' an error must be 'clear' or 'obvious.'" United States v. Ramirez-Castillo, 748 F.3d 205, 215 (4th Cir. 2014) (quoting United States v. Olano, 507 U.S. 725, 734 (1993)). Even if the error here was plain, we "may correct the error" only if it also "affects substantial rights." Olano, 507 U.S. at 732 (emphasis and alteration omitted). An error affects substantial rights "in most cases" if it "affected the outcome of the district court proceedings." Ramirez-Castillo, 748 F.3d at 215 (quoting Olano, 507 U.S. at 734).

We need not address whether the improper admission of Garcia-Lagunas's immigration status was plain because we find that it did not affect the outcome of the trial. The jury had before it substantial evidence of Garcia-Lagunas's participation in a conspiracy to distribute cocaine, and his immigration status was not referenced again after Collins's testimony. Thus, we decline to find plain error on this record.

2.

Garcia-Lagunas also challenges the government's references to his use of an interpreter at trial, arguing that they were intended to paint him as a "faker" for relying on an interpreter when he did not need one.  Appellant's Br. at 36.

The government's witnesses told the jury that they spoke to Garcia-Lagunas in English when they dealt with him, and some of those witnesses could only speak English.  To prove that Garcia-Lagunas was the man who dealt with these witnesses, the government had good reason to clarify to the jury that he could in fact speak English, in spite of the impression his use of an interpreter might have created.  We therefore find that the government's references to Garcia-Lagunas's interpreter were relevant to identity, and their probative value was not substantially outweighed by any threat of prejudice.  See Lespier, 725 F.3d at 448.  Accordingly, we find no error.

C.

1.

Garcia-Lagunas next contends that the district court erred in allowing Detective Collins to testify as an expert witness where the government failed to comply with the expert disclosure requirements.  Because the defense failed to timely object at trial, we again review for plain error.

22

Federal Rule of Criminal Procedure 16(a)(1)(G) requires the government, on the defendant's request, to provide the defendant a written summary of any expert testimony that it intends to use. That summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(a)(1)(G). "Rule 16(a)(1)(G) 'is intended to minimize surprise that often results from unexpected expert testimony . . . and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.'" United States v. Smith, 701 F.3d 1002, 1007 (4th Cir. 2012) (quoting Fed. R. Crim. P. 16(a)(1)(G) advisory committee's note to 1993 amendment).

Garcia-Lagunas points out that the government's notice that Collins would "testify about drug trafficking investigations and methods utilized by drug traffickers to operate and protect their business," J.A. 32, failed to state Collins's qualifications, opinions, or "the bases and reasons for his opinions." Appellant's Br. at 38.

While Garcia-Lagunas has a viable argument that the government's short and summary notice failed to meet the requirements of Rule 16(a)(1)(G), we need not decide whether the district court's admission of the testimony was plain error, as

23

Garcia-Lagunas cannot establish that any such error affected his substantial rights.

On that score, while Garcia-Lagunas claims that Collins's testimony was "completely unexpected," id. at 39, he fails to point to any specific portion of the testimony that took him by surprise. Collins's testimony largely served to provide the jury the contextual background of how drug trafficking organizations function and explain the significance of certain physical evidence. Given the limited scope of the physical evidence and that the government would clearly try to explain why the white powder did not test positive for any controlled substance in the laboratory, Garcia-Lagunas cannot establish that more specific notice of the scope of Collins's testimony would have so changed his counsel's ability to cross-examine Collins that the trial would have come out differently. See United States v. Jones, 739 F.3d 364, 370 (7th Cir. 2014) ("We need not consider whether the error [of admitting expert testimony without notice] could be considered plain, because [the defendant] cannot demonstrate that he would not have been convicted absent the error, or that the introduction of that testimony without complying with the expert testimony requirements resulted in a miscarriage of justice.").

2.

Garcia-Lagunas also contends that Collins's testimony explaining how the white powder might have field-tested positive but tested negative in the laboratory for any controlled substance was improper lay opinion testimony, as Collins was not an expert in SBI laboratory techniques. Counsel objected at trial; therefore we review for harmless error.

After defense counsel's objection, the government elicited testimony from Collins demonstrating his familiarity with the methods used by the SBI in its laboratory tests. In particular, he testified that he knew from his training and experience that they would test only a portion of a controlled substance. This foundation testimony adequately demonstrated Collins's competence to testify on this issue.[7]

III.

Garcia-Lagunas next challenges his sentence. "We review a criminal sentence for procedural and substantive reasonableness

---

[7] Garcia-Lagunas also contends that the district court erred in admitting lay opinion testimony from Detectives Taylor and Stein concerning the use of small plastic baggies and vacuum-sealed bags in drug trafficking. Because Garcia-Lagunas did not object at trial, we review for plain error. Garcia-Lagunas cannot meet that high bar. Given the weight of the evidence against him, we are confident that the complained-of testimony did not affect the outcome of the proceeding.

under a deferential abuse-of-discretion standard." Washington, 743 F.3d at 943 (citing Gall v. United States, 552 U.S. 38, 51 (2007)). First, we must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range." Gall, 552 U.S. at 51. If the sentence is procedurally sound, we then move on to "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." Id. Because Garcia-Lagunas did not object to any of the alleged sentencing errors, we review for plain error. United States v. Lynn, 592 F.3d 572, 576–77 (4th Cir. 2010).

A.

Garcia-Lagunas first challenges the district court's determination that it did not commit a Collins error in failing to instruct the jury to determine the quantity of cocaine Garcia-Lagunas was responsible for within the conspiracy.

For drug offenses, 21 U.S.C. § 841(b) "sets forth a graduated penalty scheme based on the quantity of drugs attributable to the defendant." United States v. Foster, 507 F.3d 233, 250 (4th Cir. 2007). The statute imposes mandatory minimum and maximum penalties when a defendant is responsible for a threshold quantity of drugs. Here, Garcia-Lagunas was convicted of a conspiracy to distribute 500 grams or more of cocaine. Under § 841(b)(1)(B), Garcia-Lagunas was subject to a

26

sentence of no less than five and no more than 40 years' imprisonment.

However, in United States v. Collins, we held that "an individual defendant, found guilty of conspiracy to violate § 841(a), [should not] be sentenced under § 841(b) by considering the amount of narcotics distributed by the entire conspiracy," 415 F.3d 304, 312 (4th Cir. 2005), but rather "the jury must determine what amount of cocaine base was attributable to [each defendant]," id. at 314.

The district court, relying on United States v. Williams, 439 F. App'x 254 (4th Cir. 2011) (per curiam), found that it did not need to submit this question to the jury, as "there [was] no uncertainty regarding the amount of cocaine the defendant distributed and no co-conspirators for the jury to consider," and therefore "the drug quantity charged in the indictment can serve as the statutory sentencing threshold under § 841(b)." J.A. 639.

We hold that this was not plain error. Although Williams was unpublished and therefore not precedential, it suggests that even if the district court erred, such error was not plain. See Williams, 439 F. App'x at 257; see also United States v. Hughes, 401 F.3d 540, 547 (4th Cir. 2005) ("An error is plain 'where the law at the time of trial was settled and clearly contrary to the law at the time of appeal.'" (quoting Johnson v. United States,

27

520 U.S. 461, 468 (1997))). In addition, there is no indication that the district court was inclined to go below the mandatory minimum of five years' imprisonment, and thus Garcia-Lagunas cannot establish that the error affected his substantial rights.

B.

Finally, Garcia-Lagunas argues that the district court erred procedurally when it calculated his offense level as 36. We agree, and also find that the error was plain and substantially affected Garcia-Lagunas's rights.

At sentencing, the district court announced that Garcia-Lagunas's total offense level was 36 after sustaining two of his objections to the PSR's calculation. The government responded that it would not object to a downward departure of two levels to reflect upcoming amendments to the Guidelines, and the court agreed to go down those two levels. Thus, Garcia-Lagunas's total offense level should have been 34, which would have yielded a Guidelines range of 151 to 188 months' imprisonment. While the 188 month sentence the court imposed was within this range, the court specifically stated that it was "impos[ing] a sentence at the low end of the range." J.A. 683. Additionally, in its "Statement of Reasons" form, the court scored Garcia-Lagunas's total offense level at 36, noting that it sustained one of Garcia-Lagunas's objections to the PSR and used the anticipated Guidelines amendment reduction, but not

28

acknowledging that it sustained a second objection.  Thus, the court's error in sentencing Garcia-Lagunas under offense level 36 instead of 34 was plain.  See United States v. Ford, 88 F.3d 1350, 1356 (4th Cir. 1996) (finding plain and prejudicial error where the erroneous addition of points to the defendant's criminal history score caused the defendant "to be sentenced at a more severe guideline range").

We also find that the error significantly affected Garcia-Lagunas's substantial rights.  The district court made clear that it intended to sentence Garcia-Lagunas at the low end of the range to reflect his lack of criminal history.  Thus, had it consulted the correct range, there is good reason to believe the court would have sentenced Garcia-Lagunas to 151, rather than 188, months' imprisonment.

This fact distinguishes United States v. Molina-Martinez, 588 F. App'x 333 (5th Cir. 2014) (per curiam), cert. granted, 136 S. Ct. 26 (2015).  There, the Fifth Circuit found that the defendant could not show that the plain error in sentencing him under the wrong offense level affected his substantial rights because (1) his sentence under the wrong level fell within the range for the correct level, and (2) he could not "point to 'additional evidence' in the record, other than the difference in ranges, to show an effect on his substantial rights." Molina-Martinez, 588 F. App'x at 334–35.  Indeed, the Fifth

29

Circuit specifically distinguished United States v. Pratt, 728 F.3d 463 (5th Cir. 2013), which had facts much more like this case. There, "the district court affirmatively stated on the record that . . . it was choosing a sentence in the middle of the Guidelines range." Molina-Martinez, 588 F. App'x at 335 (citing Pratt, 728 F.3d at 482).[8]

In United States v. Knight, 606 F.3d 171 (4th Cir. 2010), where we found the defendant had not shown that the use of an incorrect sentencing range affected her substantial rights, we explicitly distinguished a hypothetical case that is very close to what happened here. There, the district court plainly erred in sentencing Knight under a Guidelines offense level of 26, with an advisory range of 92-115 months' imprisonment, instead

---

[8] The Supreme Court has granted Molina-Martinez's petition for certiorari on the question of whether an appellate court should presume, for the purposes of plain-error review, that the application of the wrong Guidelines range to a criminal defendant affected his substantial rights. See Molina-Martinez, 136 S. Ct. 26 (2015); Petition for Certiorari, Molina-Martinez v. United States, 2015 WL 5766728 at *i (No. 14-8913). Even if the Court holds that an appellate court should not make that presumption, our finding in this case would not be affected, as we rely not on a presumption but rather on the district court's stated intent to sentence Garcia-Lagunas at the low end of the applicable Guidelines range—the "additional evidence" that was absent in Molina-Martinez. Alternatively, if the Court holds that appellate courts should presume a sentence under the incorrect Guidelines range affects a defendant's substantial rights, then it would only confirm that Garcia-Lagunas's substantial rights were affected by the error. Thus, we need not await the Supreme Court's ruling in Molina-Martinez.

of the correct level of 24, with an advisory range of 77-96 months. Knight, 606 F.3d at 177-78. The district court compared Knight favorably to another defendant the court had sentenced that day, who had received a sentence of about half of his Guidelines range. Id. at 178-79. The district court then sentenced Knight to 60 months in prison. Id. at 179. Knight argued that the court's intent was to sentence her, like the other defendant, to "roughly half" of her Guidelines range, and so the sentencing error affected her substantial rights because the court would have sentenced her to "roughly half" of 77-96 months under the correct range. Id.

We rejected this argument, finding it "pure speculation" that the sentencing "court's limited statements about the other defendant" had the meaning that Knight ascribed to them. Id. We explicitly distinguished a hypothetical case where the sentencing court either "explicitly connected Knight's sentence to the sentence given to the other defendant" or "explicitly connected the 60-month sentence ultimately imposed to the advisory range—for example, by stating that it intended to impose a sentence that was a certain percentage of the low or high end of the advisory range." Id. Here, the sentencing court did explicitly connect the sentence imposed to the advisory range, and thus Garcia-Lagunas's claim is not "pure speculation." Garcia-Lagunas therefore has shown that his

31

substantial rights were affected by the miscalculation because it is very likely "he would have received a lower sentence had the error not occurred." Id. at 178.

And though we need not always correct plain error, Keita, 742 F.3d at 189, we choose to do so here. Fairness dictates that Garcia-Lagunas be sentenced under the correct Guidelines range, particularly when doing so could potentially lead to a sentence reduction. See Ford, 88 F.3d at 1356 ("[S]entencing a defendant at the wrong guideline range seriously affects the fairness, integrity, and public reputation of the judicial proceedings."). "Three years of a man's life is not a trifling thing." Id.[9]

IV.

In sum, we hold that any evidentiary errors in Garcia-Lagunas's trial were either harmless or did not affect his substantial rights. The district court, however, plainly erred in calculating Garcia-Lagunas's Guidelines range, and such error affected his substantial rights. Accordingly, we affirm Garcia-

---

[9] As we are vacating on this issue, we need not address Garcia-Lagunas's other claim of procedural unreasonableness, his claim of substantive unreasonableness, or his claim that the district court's failure to allow him a presentence allocution affected his substantial rights.

32

Lagunas's conviction, vacate his sentence, and remand for resentencing.

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED

33

DAVIS, Senior Circuit Judge, dissenting:

The Government correctly concedes that it was constitutional error for prosecutors to elicit and rely upon testimony consisting of a blatant ethnic generalization in hopes that the jury would draw inferences adverse to Appellant Alejandro Garcia-Lagunas. Because the Government failed to prove beyond a reasonable doubt that its reliance on such testimony did not contribute to the jury's verdict, as my friends in the majority implicitly acknowledge, I am compelled to dissent from their conclusion to affirm the judgment.

During his trial, Garcia-Lagunas sought to show that he was, at most, a common drug abuser and not a sophisticated drug distributor who trafficked in large volumes of cocaine. To make this distinction, Garcia-Lagunas utilized questions during cross-examination of prosecution witnesses to establish that he lived a meager lifestyle devoid of any of the drug proceeds that should follow a high-volume distributor. For example, when cross-examining Detective Shawn Collins, Garcia-Lagunas elicited testimony about the assets discovered at the residences of Ronnie Reed, one of Garcia-Lagunas's alleged purchasers and a Government witness. J.A. 153-55. During searches of Reed's residences related to federal drug trafficking charges, officers found and ultimately seized more than $100,000 in U.S. currency, multiple telephones, a 2008 Infiniti, a 2006 Chevy Impala, a

34

2004 Acura, a 2004 BMW, a 2002 Lincoln Navigator, and multiple firearms. J.A. 154-55.

Contrasting this showing of the wealth accumulated by Reed during the four to five years that he sold drugs prior to his 2012 arrest, the cross-examinations of Detective Collins and Detective Pedro Orellano established that Garcia-Lagunas lived a life of limited means. Their testimony showed that, on the evening detectives arrested Garcia-Lagunas, he was found shirtless and shoeless in the "kitchen/living room area" of a small trailer in which he rented a room for less than $350 per month. J.A. 103-04, 315. The detectives did not find any vehicles belonging to Garcia-Lagunas, and they only uncovered $600 in currency. J.A. 176. Ultimately, Garcia-Lagunas hoped this testimony would cause the jury to ask: how can a man who is allegedly responsible for selling hundreds of thousands of dollars in cocaine[1] have no proceeds to evidence those transactions? Any experienced (and even an inexperienced) Assistant United States Attorney prosecuting cases in this Circuit would fully expect (and be prepared for) this kind of defense tack on this record.

---

[1] According to the testimony of four drug dealers testifying pursuant to plea agreements, Garcia-Lagunas sold them, in the aggregate, at least 39 kilos of cocaine, with each kilo of cocaine valuing approximately $30,000 to $32,000 during the relevant time frame. J.A. 205, 208, 239, 340-42, 360-61, 388.

As Garcia-Lagunas's defense theory became apparent during trial, however, the Government seemingly recognized for the first time the absence of drug trafficking proceeds as a potential weakness in its case.  The Government opted not to cure the ostensible weakness through the introduction of admissible evidence by, for example, moving to admit proof of wire transfers from Garcia-Lagunas to family in Mexico.  Either because such evidence did not exist[2] or because the Government failed to adequately prepare its case, it instead sought to counter the theory offered by Garcia-Lagunas by eliciting an outrageous ethnic stereotype about the propensity of "Hispanic drug traffickers" to live modestly while sending "the majority if not all the proceeds back to their native countries."  J.A. 270.  The Government then drove this racial generalization home at the outset of its closing argument, stating:

> Ladies and Gentlemen, what did Detective Orellano tell you about Hispanic drug trafficking organizations and about what they do with their money? He told you that they package that money and they send it back to their home country as part of the drug trafficking organization.  That's why we don't have an extravagant lifestyle associated with this Defendant, fancy cars, any of the things like Ronnie Reed has talked about.

---

[2] As my colleagues in the majority point out, Garcia-Lagunas has resided in the United States since he was a teenager, and the majority of his family, including his parents, spouse, and two of his children, also live in the United States, making it improbable that he was sending large amounts of money back to family in Mexico.

36

J.A. 520.

The relative ability of this particular stereotype to sway the jury is evidenced by its effect on the presiding judge. In response to a renewed objection to Detective Orellano's testimony, the trial judge held a bench conference and admitted that he "wasn't quite sure the relevance of" the Detective's testimony regarding Hispanic drug traffickers, but that, "based on [his] experience, . . . most Latins send money home whether they're drug dealers or not."[3]  J.A. 273.  The Government admittedly hoped the jurors would draw a similar inference when rendering a verdict.  J.A. 273.

As the majority explains, "[a]ppeals to racial, ethnic, or religious prejudice during the course of a trial violate a defendant's Fifth Amendment right to a fair trial."  United v. Cabrera, 222 F.3d 590, 594 (9th Cir. 2000).  A number of our sister circuits have interpreted this basic principle to mean that a constitutional error occurs when the Government

---

[3] The majority suggests that the trial judge's statements could not have independently affected the jury because they were voiced during a bench conference. To the contrary, I note that, as Juror Number 2 in a recent state criminal trial (and based on the "white noise" used in my courtroom when I served as a federal district judge), statements made during bench conferences, whether conducted under the hopeful veil of "white noise" or not, often remain within earshot of nearby and attentive jurors. There is nothing in the record here to suggest that the judge's remarks went unheard in this instance.

"invite[s] the jury to put [a defendant's] racial and cultural background into the balance in determining their guilt." United States v. Vue, 13 F. 3d 1206, 1213 (8th Cir. 1994); United States v. Cruz, 981 F.2d 659, 663-64 (2d Cir. 1992); United States v. Doe, 903 F.2d 16, 20-24 (D.C. Cir. 1990). This is exactly what the Government did here.

To counter Garcia-Lagunas's primary defense theory and cure a perceived hole in its case, the Government offered up generalizations about Garcia-Lagunas's ethnicity to the jury. The Government hoped that, like the presiding judge, the jurors would believe that Garcia-Lagunas's modest lifestyle did not undermine allegations that he distributed hundreds of thousands of dollars in cocaine because he had assuredly been sending his significant proceeds back to his native country, electing to live like a pauper here. And while the majority seeks to distinguish the ethnic generalization tactically elicited and repeated in this case on the ground that the ethnically based "evidence" was used in a more nuanced fashion than was true in the cases decided in our sister circuits, the Government's specific method for injecting Garcia-Lagunas's ethnicity as evidence in favor of his guilt makes it no less improper.

Most tellingly, even the Government concedes that the elicitation of Detective Orellano's testimony during re-direct and recitation of the testimony at the outset of closing

38

argument amounted to a constitutional error. Oral Argument at 20:38-20:51, United States v. Garcia-Lagunas, No. 14-4370 (Sept. 17, 2015), available at http://coop.ca4.uscourts.gov/OAarchive/mp3/14-4370-20150917.mps. During oral argument, when asked whether the error amounted to constitutional error, counsel for the Government responded unequivocally, "Yes." Id. The Panel then asked, as a result of the Government's belief that constitutional error had occurred, whether it was the Government's burden "to prove beyond a reasonable doubt that the error had no substantial effect on the jury's verdict." Id. In response, counsel for the Government firmly stated, "That's correct." Id.

Accordingly, because the Government's appeal to an ethnic generalization was plainly a constitutional error and because the Government failed to prove beyond a reasonable doubt that its reliance on such testimony did not contribute to the jury's verdict in a drug conspiracy case resting almost entirely on the testimony of four drug dealers testifying pursuant to plea agreements, I would vacate and remand for a new trial. By rejecting the Government's concession that constitutional error occurred here, and thereby refusing to apply the only applicable harmlessness standard, the majority affirms the conviction because there was sufficient evidence to support it.

It errs in doing so. I respectfully dissent.